137 N.J. Super. 167 (1975)
348 A.2d 225
STATE OF NEW JERSEY, PLAINTIFF
v.
AGNES LEWIS, CONSTANCE CAPPETO AND ATLEY CAPPETO, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided September 26, 1975.
*168 Mr. Ronald A. Abramowitz, Assistant Prosecutor for the State (Mr. Edward W. McGrath, Prosecutor of Union County, attorney).
Mr. Barry M. Epstein for defendant Agnes Lewis (Messrs. Reibel, Isaac, Tannenbaum & Epstein, attorneys).
Mr. Ralph G. Sullivan for defendants Constance Cappeto and Atley Cappeto (Messrs. Rinaldo and Rinaldo, attorneys).
TRIARSI, J.S.C.
This is a motion to dismiss the indictment wherein the question before the court appears to be one of first impression. Simply stated, does due process require the dismissal of an indictment where certain documentary evidence claimed to be essential to the defense was utilized by defendants in a prior civil proceeding in the Superior Court and inexplicably lost while in the custody and possession of that court or the clerk of the Surrogate's Court? Defendants make no allegation of negligence or misconduct on the *169 part of the prosecutor. A detailed statement of facts is indispensable to the proper resolution of this motion.

I
In May 1972 "The Matter of the Probate of the Alleged Will of James H. Lewis, James Hamilton Lewis and J. Hamilton Lewis, Deceased," was heard in the Superior Court of Union County, Probate Division. The will had been admitted to probate on May 5, 1971 by the Union County Surrogate, but decedent's son and daughter subsequently filed an order to show cause seeking to have the probate set aside on the ground that the signature on the will was a forgery. Defendant Agnes Lewis, the administratrix of the estate and proponent in the probate proceeding, was also named sole beneficiary. Defendants Constance Cappeto, decedent's sister-in-law, and Atley Cappeto, her son, were the subscribing witnesses to the will.
During the course of the Superior Court action each side presented expert testimony as to the authenticity of the signature, both Cappetos testifying that the will was genuine. Additionally, approximately 15 exhibits were introduced on behalf of the proponent and utilized by her to compare favorably with the questioned signature and to effectively cross-examine objectors' experts. All of these documents, along with the original will, have inexplicably vanished. Exhaustive efforts to locate them were made to no avail.
Approximately two years subsequent to the probate proceeding the present six-count indictment was returned against defendants by the Union County grand jury. Count one charges all defendants with conspiring to commit perjury, to utter forged instruments and to obtain money and property by false pretenses. Count two charges all defendants with attempting to obtain money and property by false pretenses. Count three charges Agnes Lewis and Constance Cappeto with uttering a forged instrument, to wit, a deputy card. Count four charges Agnes Lewis and Constance Cappeto *170 with uttering a forged instrument, to wit, the purported last will and testament of James H. Lewis. Counts five and six charge Constance and Atley Cappeto with perjury, respectively. The above charges, except for count three concerning the deputy card, are in varying degrees related to the authenticity of the alleged signature of James H. Lewis on the purported will. It is this relationship which forms the nexus between the probate proceeding and this indictment. Defendants now move to dismiss the entire indictment on the aforementioned grounds.
Initially, there was some confusion in attempting to explicitly identify those documents used by the proponent (one of the defendants) and now missing. However, I am satisfied after a review of the transcript of the probate matter and the testimony received on this motion that the following documents admitted into evidence were lost and cannot be located:
The original will (P-1) Six checks designated 691 (P-8), 704 (P-9), 732 (P-10), 924 (P-11), 930 (P-12), and 745 (P-18) Letter dated April 1, 1971 (P-4) Letter dated February 12, 1971 (P-5) Release of mortgage (P-6) Mortgage (P-7) Original contract of sale (P-13) Photographic collages (P-14 to 17).

II
The principle that a conviction violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution where it has been obtained through suppression of evidence favorable to the accused has been announced in a long line of Supreme Court decisions, the most familiar of which is Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Defendants properly cite Brady for the proposition that it is the duty of the State to disclose all evidence favorable to the defense, but they fail to make any allegation that the prosecutor willfully concealed *171 the evidence or has even been negligent in the matter. However, it is questionable whether such an allegation is required under Brady or any of the relevant federal cases:
We now hold that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. [373 U.S. at 87, 83 S.Ct. at 1197 emphasis supplied]
United States v. Heath, 147 F. Supp. 877 (D. Hawaii 1957), aff'd 260 F.2d 623 (9 Cir.1957), cited by defendants, seems to be the closest case on point. Unlike an actual "suppression" of evidence by the prosecution, defendant simply alleged that the government lost essential tax records seized from him by Internal Revenue agents and that it would be unfair to force him to go to trial without them. The government argued that the loss was not wilful but the court nevertheless dismissed the indictment, stating:
Shall this accused and the government now proceed to go through a lengthy and costly criminal trial known to be tainted with reversible error? * * * The fact that the records were lost and were not wilfully withheld from the accused may place the government in a more favorable moral light, but this is no comfort to the accused, nor does it aid him in the preparation of his defense to the charges contained in the indictment. [147 F. Supp. at 878]
Similarly, in United States v. Consolidated Laundries Corp., 291 F.2d 563 (2 Cir.1961), defendants who were charged with violations of sections one and two of the Sherman Act alleged that certain documents bearing on the testimony of a principal government witness which came to light in a subsequent civil action were negligently lost by the government during the criminal trial. The government disputed that any negligence was proved on its part, but the court reversed the conviction notwithstanding, stating that the government was the custodian of the evidence and had a duty to keep it "in such a manner that it would be *172 available for use upon the trial by all parties * * *" [at 570][1]
To be sure, in all of the above cases the prosecution played some part in the loss or suppression of the evidence in question. That the prosecution has acted without blemish certainly is a factor to be considered in determining the nature of relief, if any, a defendant is granted. United States v. Bryant, 142 U.S. App. D.C. 132, 439 F.2d 642 (D.C. Cir.1971) on remand 331 F. Supp. 927 (D.C. 1971), aff'd 145 U.S. App. D.C. 259, 448 F.2d 1182 (D.C. Cir.1971). Nevertheless, I firmly believe that the custodial duty mentioned in Consolidated Laundries, supra, transcends to the present case and the indictment must be dismissed if the misplaced evidence is vital to the defense.
In a criminal proceeding the State of New Jersey is the prosecutorial party; it cannot atomize itself into hundreds of totally independent agencies. Responsibility in such matters must be interrelated. Hence, regardless of which agency within the State has been negligent  be it the prosecutor, the surrogate or the court  the State, not defendant, must suffer the consequences. As the court in Heath, supra, noted, the fact that the prosecutor himself has not been negligent is no comfort to an accused deprived of a vital defense through no fault of his own. 147 F. Supp. at 878.
In arriving at this conclusion one should bear in mind the practical aspects of a rule to the contrary. In this day and age, with a plethora of administrative agencies empowered *173 to license, regulate and investigate our daily activities, I am loath to announce a rule which would deprive defendants of relief save when the prosecutor himself has been negligent. Of course, society may suffer when an accused is set free with no opportunity for the State to remedy its error, but what the Supreme Court wrote on the opposite side of the coin in Brady, supra, is equally applicable to the present case:
* * * Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. [373 U.S. at 87, 83 S.Ct. at 1197]
And in a similar vein, it has long been the law in this State that "the primary duty of the State in criminal prosecutions is not to seek conviction; it is to see that justice is done and truth is revealed." State v. Vigliano, 50 N.J. 51, 60 (1967); State v. Farrell, 61 N.J. 99 (1972); State v. Cook, 43 N.J. 560 (1965).

III
Notwithstanding the above, the State correctly advances the argument that the indictment should not be dismissed unless defendants can show that the misplaced evidence is material to the defense. Most cases do hold that where there has been a loss of evidence despite due care, as opposed to good or bad faith suppression, some showing of materiality is required. Thus in United States v. Isaacs, 347 F. Supp. 763 (N.D. Ill., E.D. 1972), defendant moved the court to dismiss one count of an indictment which alleged misrepresentation of a fact to federal agents because the agents had destroyed their own rough notes of the interview after a formal memo had been prepared. The court denied the motion, holding that defendant had not been sufficiently prejudiced. Likewise in United States v. Sewar, 468 F.2d 236, 238 (9 Cir.1972), a prosecution for manslaughter *174 on a federal reservation, a technician had discarded a blood sample after making two tests to determine the blood alcohol content. The court refused to suppress the results of the test, stating that "in the circumstances [it would not], be so unfair as to require exclusion * * *"[2]
The State's argument on materiality runs amiss in the present case, however, because defendants have adequately demonstrated sufficient prejudice. The prosecutor contends that numerous other exemplars of decedent's signature exist which should be satisfactory to the defense. However, the testimony of the attorney for proponent clearly indicated the significance of the missing documents. In preparing for that proceeding he collected all available exemplars and culled from them 10 to 15 exhibits which were most illustrative of the characteristics appearing in the questioned signature. He was also alerted by proponent's expert that a tremor was developing in decedent's signature which appeared in the will, and he selected at least two documents, a contract of sale (P-13) and a letter (P-5), both executed approximately six weeks prior to decedent's death, which exhibited signatures indicative of this tremor. These carefully selected exemplars are now gone.
Furthermore, regardless of whether the State feels that other exhibits "may" be satisfactory to the defense, we have yet to arrive at the time and place when liberty is to be afforded a prosecutor to select exhibits for and on behalf of a defendant. A similar argument asserted by the government was rejected by the Supreme Court in Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). There defendants alleged that their convictions *175 were based on evidence which was the fruit of illegal wiretaps, but the government refused to disclose the nature and content of the conversations on the grounds of national security. Instead, it wished to select on its own all conversations "arguably relevant" to the convictions, or, in the alternative, to submit them to the court for an in camera examination to determine whether any conversations were "arguably relevant" and therefore could have tainted defendants' convictions. Despite serious consequences to national security (disclosure would necessarily reveal the location of the wiretaps), the court held that such a review is no substitute for adversary proceedings. In essence, the State in the present case, as in Alderman, has made its own ex parte determination that the evidence it has available is satisfactory to defendants. Yet, if the tables were turned, the State would not tolerate a defendant selecting which evidence is sufficient for the prosecution. Even the President of the United States could not "pick and choose" as he pleased. United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).
The State responds by claiming that photostatic copies of some of the documents are available, especially the missing will, and contends, by referring to testimony of objectors' experts in the probate proceeding, that examination of the originals is unnecessary. But proponent's expert, Mrs. Renee C. Martin, left no doubt as to the significance of an original. She testified flatly that "a copy is never as good as an original," and speculated that objectors' experts might have reached a different conclusion as to authenticity because they did not examine a few of the concurrent exemplars and in addition did possess the originals. Furthermore, Mrs. Martin illustrated to the court itself, using a magnifier, the absence of pen lifts and ink blots in the originals, characteristics which she testified would not appear in a copy. I am satisfied that the testimony of Mrs. Martin in the probate proceeding is credible, especially since *176 it was elicited at that time without view toward the dispute at hand.
In addition to the technical problems created by the loss of these documents, defendants will suffer at trial in other ways. During the probate proceeding the attorney for the proponent (defendant Lewis) utilized these exhibits to cross examine objectors' experts, Carl Acheffenburg and Daniel S. Anthony. At one point three of the missing checks, identified as P-8, P-10 and P-11, were shown to Mr. Anthony with regard to the similarity of the letter "H" in the exemplars to the letter appearing in the questioned signature. Upon being shown the third check, P-11, he gave the startling answer to the following question:
Q. And on the check of March 1, 1971, which has been marked P-11, isn't there a similar fault or retracing or hesitation in the drawing of the "H"?
A. It's amazing, you're beginning to show a pattern of a slight trouble with the downstroke on the lefthand of the "H" and you've shown me three checks and I would have to agree with you, yes, sir.
When he was given check number 745, identified as P-18, this exchange took place:
Q. I show you a document, check number 745 of the same account, dated July 12, 1968, and ask you whether the "L" more nearly resembles the disputed document or the characteristics you described as being Mr. Lewis'?
A. Well, I will have to admit to you, sir, it more nearly describes the other except that it does fall three millimeters below the baseline, so, you get fifty per cent and I get fifty per cent.
Again referring to inconsistencies in the capital "H" which appeared in the questioned will, counsel used the lost original contract of sale (P-13) and this colloquy ensued:
A. * * * The visible mistake on this one would be the capital "H", again something could have been under the piece of paper that completely stopped him, because he did get a chance to make the first "H" bar.
*177 Q. And he broke in the middle of it, the capital "H", and did it?
A. Yes, sir, you are right.
Counsel also cross-examined Acheffenburg, working with a number of the lost exhibits. Again, concessions were elicited from the expert. For example:
Q. * * * I'll show you check 704 and ask you whether you believe this to be genuine?
A. I think so, yes.
Q. And in that is it not true also that the letter "H" is drawn with a certain amount of tremor or irregularity?
A. Yes.
Q. And is it not true that the left staff of the "H" approximates the right in height?
A. Well, the right is higher than the left.
Q. Pretty close, isn't it?
A. I'm not sure, but, there's no question it's authentic.
But in a larger sense, regardless of whether or not cross-examination discredited the testimony of these witnesses, it is clear from the transcript, without recounting all of the testimony, that the documents in question played an essential role on cross-examination at the probate proceeding. Without these selected exemplars, defendants will be deprived at trial of this effective arsenal.
Notwithstanding any negative impact arising from the loss, defendants may also be unable to make affirmative use of these exhibits as evidence to submit to the jury, or to buttress any expert testimony they wish to present. Furthermore, the defense is now precluded from consulting additional experts with the same exemplars upon which their former expert, Mrs. Martin based her opinion. Hence, they may be ultimately prevented from procuring any additional favorable opinions and testimony.
The cumulative effect of these factors would unquestionably deprive the defendants of a chance to create reasonable doubt in the minds of a jury. Therefore, I am satisfied that the evidence in question is not only material but is vital to the defense.

*178 IV
Regardless of the number of cases cited, or the arguments advanced, the right to due process essentially boils down to whether an accused has "a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). I am convinced that in the instant case defendants do not. However, defendants' motion was directed without specificity to the entire six-count indictment. Since the State admits in its brief that "5 counts relate directly to authenticity [sic] of the alleged signature of James H. Lewis on the document purported to be his Last Will and Testament," defendants' motion to dismiss is granted with respect to those five counts. As to the remaining count three charging defendants Agnes Lewis and Constance Cappeto with uttering a forged deputy card, the motion is denied at this time because of an absence of proof and argument directed thereto. However, the right to renew this motion is reserved to the defendants.
NOTES
[1] See also: Trimble v. State, 75 N.M. 183, 402 P.2d 162 (Sup. Ct. 1965) (the State seized and lost a letter and mishandled certain magnetic tapes, both of which defendant contended corroborated his version of the homicide. The court, citing Brady, held that defendant was denied due process irrespective of any prosecutorial bad faith); State v. Cahill, 125 N.J. Super. 492 (Law Div. 1973) (defendant's motion for a new trial was granted because the prosecutor unintentionally failed to bring to the jury's attention a witness's prior inconsistent statement already known to the defense).
[2] See also, United States v. Fried, 359 F. Supp. 227 (E.D.N.Y. 1973), aff'd in part, rev'd in part 486 F.2d 201 (2 Cir.1973), cert. den. 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 759 (1974), where the court held that on a motion for a new trial based upon a nondeliberate suppression, a showing must be made that the evidence would probably have produced a different verdict.