226 N.J. Super. 25 (1988)
543 A.2d 466
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
BRIAN PETERKIN, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
HAROLD SHAW, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
DARRYL HUBBARD, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
CHARLES CALDWELL, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
JAMES NOBLES, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
JAMES TROY TILLET, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
GEORGE BASS, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
HUGH ROBINSON, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
KEVIN WASHINGTON, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
MICHAEL RUSH, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
TONEY JENNINGS, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
LEON CHALMERS, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
DARRYL GREEN, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
SAM IRVING, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
KENNETH HOUSER, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
BYRON MONTGOMERY, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
RODNEY JONES, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 23, 1988.
Decided June 21, 1988.
*29 Before Judges PETRELLA, BAIME and ASHBEY.
Joseph P. Connor, Jr., Assistant Prosecutor of Morris County, argued the cause for appellant (Lee S. Trumbull, Prosecutor, attorney; Joseph P. Connor on the brief).
Craig V. O'Connor, designated counsel, argued the cause for respondents Shaw, Hubbard, Peterkin, Caldwell, Nobles, Houser, Tillett, Chalmers and Jennings (Alfred A. Slocum, Public Defender, attorney; Richard F. Healey, William P. Cuocco and Craig V. O'Connor on the brief).
Mark J. Malone argued the cause for respondent Jones (Malone & Villere, attorneys; Mark J. Malone on the letter-brief).
Joseph Smyth argued the cause for respondent Montgomery (Bianchi and Casale, attorneys; Angelo R. Bianchi on the brief).
Courter, Kobert, Laufer, Purcell and Pease, attorneys for respondent Bass, joined in the brief filed on behalf of Peterkin, et al.
Alfred A. Slocum, Public Defender, attorney for respondents Chalmers and Jennings, joined in the brief filed on behalf of *30 Peterkin, et al. (Joel M. Harris, Deputy Public Defender, of counsel).
Jeffrey M. Advokat, attorney for respondents Rush and Green, joined in the brief filed on behalf of Peterkin, et al.
Paul M. Sellito, attorney for respondent Irving, joined in the brief filed on behalf of Peterkin, et al.
D'Allessandro, Sussman, Jacovino and Mahoney, attorneys for respondent Robinson, joined in the brief filed on behalf of Peterkin, et al.
Alfred A. Slocum, Public Defender, attorney for respondent Tillett (Robert W. Thompson, Assistant Deputy Public Defender, on the brief).
Ryan, Pedicini and Donnelly, attorneys for respondent Washington (Rita E. Donnelly on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
This appeal presents questions of public concern. Following a protracted pretrial hearing, the trial court dismissed 17 indictments charging defendants with possession of cocaine (N.J.S.A. 24:21-20a(1)), possession with intent to distribute (N.J.S.A. 24:21-19a(1)) and distribution of the same controlled dangerous substance (N.J.S.A. 24:21-19a(2)). The court's determination was predicated upon its finding that the police had suppressed crucial identification evidence connected with an extensive undercover drug investigation. The proofs supporting this conclusion revealed that one of the principal investigating police officers failed to preserve the photographic arrays from which identifications of defendants were made and attempted to conceal his dereliction by fabricating incriminatory evidence. At issue is whether the flagrantly illegal conduct of the officer irreparably impaired defendants' rights to a fair trial.
While we find the officer's brazen misconduct wholly reprehensible, we question whether the public must pay the price by *31 forfeiting its day in court on otherwise properly found indictments. In our view, the tension between the interests of public security and individual rights can best be alleviated by remanding the matter for further proceedings to determine whether the taint emanating from this shocking incident can be purged and the prosecution conducted with unsullied evidence.

I.
The salient facts are as follows. The indictments against defendants had their genesis in an extensive State Police undercover investigation into allegations of widespread sales of unlawful drugs in an area of Morristown known as the "Hollow." The project was conducted by the State Police with the cooperation and assistance of the Morristown Police Department. Although the record is not altogether clear, it would appear that the Hollow is heavily populated by black people. The plan thus envisioned that State Police Detective Roy Daniels, a black man, would be placed in the area over an extended period of time with the mission to ferret out and ultimately arrest those engaged in drug trafficking.
Daniels commenced his assignment in early June 1984. Dressed in jeans, sneakers, and wearing uncombed hair and a beard, Daniels attempted to infiltrate the drug community by patronizing local taverns and by making himself visible at traditional meeting places on the streets. During the ensuing four and one-half months, Daniels was able to purchase drugs on approximately 60 occasions. Under the established modus operandi, Daniels would make the purchase and, using photographs provided by the Morristown Police Department, would then attempt to learn the seller's identity.
James Smith, a veteran Morristown Police Detective, was assigned to assist Daniels in the identification process. Smith was chosen for the investigation because he knew most of the denizens of the targeted area. The record reflects that the Morristown Police Department uses what was characterized as *32 the "ident-a-kit" system of classifying "mug shots" by race, age, height, color and type of hair. After each purchase, Daniels would provide Smith with a general description of the seller. There is a conflict in the testimony regarding the manner in which photographs were shown to Daniels. While uncontradicted evidence was presented that all of the photographs were full front views of black men, Daniels and Smith testified that they were displayed in folders of six, while another officer who happened to be present on several occasions claimed that the "mug shots" were shown in "stack[s] of ten to 15." After making an identification, Daniels would remove the photograph and place it in a State Police file which he kept.
Ordinarily when conducting photographic identifications, Smith would preserve the photographic array and prepare a report memorializing the procedure employed. However, Smith testified that he deviated from his usual practice because of the large quantity of photographs used during the course of the lengthy investigation. Smith further testified that this problem was accentuated by orders he received from his superior in the Morristown Police Department directing him to refrain from preparing any report relating to the investigation. Although no reason for the prohibition was ever given to Smith, Daniels speculated that it was prompted by the need for secrecy and the danger of "leaks," which risk was particularly acute in light of the nature and extended time period of the investigation.
The investigation culminated in the arrest of 32 individuals. On November 30, 1984, the day of the arrests, Daniels and Smith were placed in an anteroom adjacent to a larger office where each suspect was processed. By use of a one-way mirror, Daniels identified each arrestee. According to Daniels, he identified some 30 individuals without any prompting or suggestion from Smith.
Following the return of the indictments, specific cases were assigned to various Assistant Morris County Prosecutors. In *33 the course of pretrial discovery proceedings, Assistant Prosecutor Thomas J. Critchley asked Investigator Mary Ann Hemphill to make arrangements with the Morristown Police for one of the defense attorneys to view the photographic arrays.
Hemphill contacted Daniels and asked for the six photographs he had referred to in his report on the Rodney Jones case. In response Daniels said he had only one photograph of Jones. Hemphill then contacted Smith, who told her that the photographs which had been shown to Daniels had been returned to the master file. She asked Smith to look through Jones' file for a record of the five other photographs which had been shown to Daniels. Smith did not immediately respond to this request, but later returned Hemphill's call, saying he could provide her with the five photographs. At Hemphill's request, Daniels delivered certain photographs to the prosecutor's office.
On the photograph provided by Daniels from his separate State Police file, the identification plate had been blacked out, and Daniels' initials and the date had been written on the back. Daniels testified that when he first removed the photograph from the folder in which it was displayed, the identification information was visible, but he blocked it out with a black magic marker, saying this was his own procedure which he had learned to utilize from experience. Daniels said in previous dealings he had learned that having "pedigree" information on the front of photographs had caused problems, but he could not further explain why it was necessary to black out this material. Hemphill testified that on the five photographs she had received from Smith, the identification plates had been blacked out as well.
Hemphill contacted Smith and asked for documentation regarding the identity of the five photographs he had provided, but he told her he had been instructed not to prepare reports. When she saw Daniels in the prosecutor's office, Hemphill expressed concern about the lack of identification on any of the *34 photographs, but Daniels said that he saw no problem with the arrays.
Hemphill remained skeptical, however, and reported the problem with the identification to Assistant Prosecutor Giles Casaleggio, who had been assigned to represent the State in all the present cases. At approximately the same time, another investigator apparently found similar problems with other cases emanating from the "Hollow" investigation. At that point, Casaleggio became concerned and arranged a meeting with Smith, which took place on March 27, 1985.
Smith brought to this meeting identification sheets which purported to describe the identification procedures utilized, but which did not have the corresponding photographs attached. Casaleggio asked why Smith had not provided these reports earlier. Smith replied that he did not know they were important and that he did not have any other notes or documents pertaining to the case. Although Smith did not tell Casaleggio when he had prepared the identification sheets, the prosecutor assumed they had been done during the summer or fall of 1984 because they appeared to correspond to the information in the police reports.
On April 2, 1985, Smith, in an obviously agitated state, called Hemphill and asked if the array he had provided had been shown to Jones' defense attorney. Hemphill told Smith that she had forwarded all discovery materials to the defense attorney and that he had obtained photocopies of the photographs as well. Smith then confessed that one of the photographs he had provided had not been taken until after the date that the array had been shown to Daniels. Smith pleaded with Hemphill to keep this dereliction confidential, but she refused and relayed this information to Critchley.
However, Casaleggio was not immediately apprised of these events. Instead, he independently learned of Smith's chicanery in the course of preparing other cases. On April 3, Casaleggio met with another investigator who had also received identification *35 sheets and photocopies of the array from Smith. In examining these documents, he discovered that in almost every case the photocopy of the "mug shot" of the defendant in the array which Smith had provided did not match the photograph that Daniels had placed in his separate State Police file. Since the dates and identification numbers in the arrays had been obliterated, there was no way of knowing if the five photographs, other than that of each defendant, had been in existence on the date of the identification.
Casaleggio contacted Smith and asked about these discrepancies. At that point, Smith admitted that the arrays he had provided to the prosecutor's office constituted mere "reconstructions," and did not depict the actual photographs that had been shown to Daniels. At the pretrial hearing, Smith testified that upon receiving Hemphill's requests for the photographic arrays, he randomly selected "mug shots" in the police department's files. Because Daniels had removed the photograph of each defendant he had identified, Smith was unable to forward it to the prosecutor's office. Instead, Smith found an additional photograph of each defendant and included it with the other "mug shots" he had randomly selected.
Smith maintained that he had never intended to represent these reproductions as exact duplicates of the original arrays because he had had no way of knowing which of the photographs in the files were the ones Daniels had viewed during the course of the investigation. However, it is undisputed that when Smith first delivered the photographs to the prosecutor's office, no one knew that they were not the ones which had actually been shown to Daniels. At least in retrospect, it would appear that Smith's silence was not inadvertent in this respect, but rather was designed to mislead. Thus, even when the prosecutor's investigators learned that the arrays had been "reconstructed," they believed that Smith had obtained from the police department's file the exact photographs which had been shown to Daniels.
*36 After learning the full extent of Smith's misconduct, Casaleggio contacted the trial judge and all of the attorneys who had either been retained or assigned to represent the defendants. Pretrial hearings were conducted as to four of the 32 defendants in an attempt to avoid repetition and delay. We need not recount at length the evidence presented. Suffice it to say, Smith continued to maintain that he had not intended to mislead or deceive anyone. Nevertheless, while detailed evidence was presented on the subject, the trial judge expressed skepticism not only with respect to Smith's motives, but also with regard to the police officer's testimony, and that of Daniels as well, concerning the identification procedures utilized.
In the course of his oral opinion, the judge identified seven "irregularities" which characterized the identification methods employed. First, the judge emphasized the failure of the police to prepare and maintain records concerning the identification of the defendants. Second, the photographic arrays from which the identifications had been made had not been preserved. Third, Daniels had retained the photographs of each defendant and thus his ability to make objective and fair in-court identification perhaps had been compromised. Fourth, the identification or "pedigree" information on each photograph had been obliterated. Fifth, on occasion Smith had apprised Daniels of the name of a suspect based on Daniels' general description of the seller and this might have affected the identifications made. Sixth, Daniels had routinely destroyed tape recordings that he had dictated during the course of the investigation. Seventh, and obviously most disturbing, Smith had deliberately concealed his failure to preserve the photographic arrays and maintain adequate records and had fabricated evidence in an attempt to hide his transgression.
The trial court concluded that these "irregularities" "cast doubt" on the credibility of both Smith and Daniels. The court's impression of their lack of credibility was further bolstered by its perceptions of their demeanor while testifying. The judge found that Smith and Daniels had violated the due *37 process rights of the defendants and, by reason of their misconduct, had rendered impossible the ability to make an informed and fair judgment concerning the reliability of the identification techniques utilized. In essence, the court determined that evidence had been suppressed, that Smith had embarked upon an attempt to "cover up" his misconduct and that the evidence irretrievably lost was material.
In fashioning a remedy for these abuses, the trial court recognized the possibility that Daniels could perhaps make in-court identifications based solely on his observations of the defendants at the time of the criminal events. Because of the possibility of an untainted identification resting on a wholly independent source, the court was loath to dismiss all of the indictments. Instead, the court drew a distinction, which it admitted was somewhat arbitrary, between defendants who had been charged with multiple drug sales and those charged with two or less. In making this distinction, the court reasoned that the reliability of Daniels' in-court identification of a defendant would be enhanced by the number of drug transactions he witnessed. On this basis, the court dismissed all indictments in which defendants were charged with no more than two drug sales. The State appeals from the orders accordingly entered.

II.
We commence our discussion with certain prefatory comments. The trial court was understandably disturbed by what can be fairly and reasonably characterized as the brazen and lawless conduct of Detective Smith. We too are outraged by the events that have unfolded. The fact that the individual responsible is a law enforcement official heightens our concern and sparks our sense of outrage. It is a "fundamental precept that courts may not abide illegality committed by the guardians of the law." State v. Molnar, 81 N.J. 475, 484 (1980). The first rule should be that those entrusted with enforcement of the law must abide by its commands. To permit lawless *38 conduct by a police officer to go unpunished would "erode public confidence in the impartiality and fairness of the judicial process." Id. at 485. One cannot reasonably deny the need for some remedy to combat such egregious police misconduct.
This mandate raises the question whether fundamental fairness requires dismissal of the prosecutions. The issue must be considered in the context of the values involved. We would be remiss were we not to note that the capacity of our society to deal with the demands of law enforcement is questioned by a substantial body of responsible people. The reasons are several. One is the perception which is harbored by a segment of the public that our system is too concerned with the rights of defendants, often at the expense of the victims of criminal attack. We have no occasion here to address questions concerning the accuracy or inaccuracy of this charge. We merely note that dismissal of a criminal prosecution without inquiry into its merits or the defendant's guilt or innocence is sometimes necessary under the thesis that the "price of occasional failures of justice" is fairly compensated by the more enduring and broader interest of the general public security. State v. Fary, 19 N.J. 431, 434 (1955).
This much conceded, our courts have long held that a dismissal of an indictment is a draconian remedy and "should not be exercised except on `the clearest and plainest ground.'" State v. New Jersey Trade Waste Ass'n, 96 N.J. 8, 18-19 (1984), quoting State v. Weleck, 10 N.J. 355, 364 (1952). See also State v. LaFera, 35 N.J. 75, 81 (1961); State v. Porro, 175 N.J. Super. 49, 51 (App.Div. 1980); State v. Davidson, 116 N.J.L. 325, 328 (Sup.Ct. 1936). An indictment should stand "unless [it] is palpably defective." State v. Russo, 6 N.J. Super. 250, 254 (App.Div. 1950), certif. den. 4 N.J. 456 (1950). This well-recognized principle comports with the thesis that criminal cases should ordinarily be decided on the merits after a full and impartial trial.
*39 Against this backdrop, we are convinced that the present prosecutions should be aborted only upon a finding that defendants' rights to a fair trial have been irretrievably lost because of the police misconduct committed. Resolution of this question depends in part upon whether identification of defendants in court can be made independent of the taint attributable to the failure of the police to preserve the photographic arrays and the subsequent cover up. Because this possibility was not sufficiently explored at the pretrial hearing, we are of the view that a remand is necessary.

III.
At the outset, we emphasize that this appeal does not concern prosecutorial concealment or suppression of exculpatory and material evidence. The State did not conceal evidence in the literal sense. In fact, the opposite is true. Members of the Morris County Prosecutor's office, mindful of the duty inherent in their public positions, and based upon suspicions engendered by their independent investigation, exposed incidents of official misconduct and candidly disclosed these acts to defendants and the trial court. The simple and overriding fact is that defendants' attorneys were immediately informed of Detective Smith's failure to preserve the photographic arrays and his subsequent efforts to conceal this fact. Smith's clumsy attempt to "cover up" his gross negligence in failing to preserve the photographic arrays is now a matter of public record. The entire incident can only inure to defendants' benefit since it can be used by counsel at trial to cast doubt on the integrity of the investigation. To that extent, this appeal does not directly implicate what the United States Supreme Court has "loosely ... called the area of constitutionally guaranteed access to evidence...." United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193, 1203 (1982). We repeat this case does not involve constitutionally offensive "suppression by the prosecution of evidence favorable to [the] accused...." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 *40 L.Ed.2d 215, 218 (1963). See also United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342, 349 (1976); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); State v. Carter, 91 N.J. 86, 110-116 (1982).
We are obliged, therefore, to focus on a somewhat related inquiry. Specifically, it must be determined whether defendants' rights to a fair trial have been impaired by the failure of the police to preserve the photographic arrays from which identifications were made.
We do not doubt that it is incumbent on law enforcement officials to record photographic arrays, toward the end that the fairness of the identification procedures employed can later be scrutinized and perhaps challenged. In State v. Earle, 60 N.J. 550 (1972), our Supreme Court made this responsibility explicit by stating that "enforcement authorities should ... make a complete record of an identification procedure if it is feasible to do so" in order to insure "that the event may be reconstructed in the testimony." Id. at 582. The Court went on to note that "[i]f the identification is made or attempted on the basis of photographs, a record should be made of the photographs exhibited." Ibid.
We also do not question the importance attached to this responsibility. Indeed, the right of a defendant to have counsel present at a corporeal pretrial line-up rests in part upon the accused's presumed inability to reconstruct the event at trial. See United States v. Wade, 388 U.S. 218, 232-236, 87 S.Ct. 1926, 1934-1937, 18 L.Ed.2d 1149, 1160-1162 (1967). No similar right is said to attach to pretrial photographic identifications because photographic arrays can be preserved and the defendant's ability to reconstruct and challenge the procedures employed is thus not compromised. See United States v. Ash, 413 U.S. 300, 319, 93 S.Ct. 2568, 2578, 37 L.Ed.2d 619, 632 (1973). See also State v. Farrow, 61 N.J. 434, 446-450 (1972), cert. den. 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1973).
*41 The question remains, however, whether an otherwise valid indictment should be vitiated based upon a police officer's failure to comply with this legal duty. The issue was broached in State v. Earle, supra, but was not expressly resolved. 60 N.J. at 552. While declining to "say [that] a failure hereafter to follow such procedures [would] itself invalidate an identification," the Court observed that "such an omission, if not explained, should be weighed in deciding upon the probative value of the identification, out-of-court and in-court." Ibid.
Our research discloses only one other reported New Jersey decision dealing with the precise issue. In State v. Zarinsky, 143 N.J. Super. 35 (App.Div. 1976), aff'd 75 N.J. 101 (1977), we had occasion to review a determination by a trial court permitting in-court identifications of the defendant by four witnesses but barring testimony relating to pretrial photographic identifications on the basis that the photographic arrays had not been preserved. Id. at 57-58. We upheld the trial court's ruling on the ground that the in-court identifications rested upon the "independent recollections" of the witnesses from their observations made at the time of the criminal event. Id. at 58.
The federal courts have also confronted the question, but have reached disparate results. Several courts have held that "in situations where the police fail to preserve the photographic array, there shall exist a presumption that the array is impermissibly suggestive." Branch v. Estelle, 631 F.2d 1229, 1234 (5 Cir.1980). See also United States v. Sonderup, 639 F.2d 294, 298-299 (5 Cir.1981), reh'g den. 453 U.S. 928, 102 S.Ct. 892, 69 L.Ed.2d 1024 (1981). Others have declined to follow that approach. See Sales v. Harris, 675 F.2d 532, 538 n. 3 (2 Cir.1982), cert. den. 459 U.S. 876, 103 S.Ct. 170, 74 L.Ed.2d 140 (1982); Brown v. Streeter, 649 F. Supp. 1554, 1558 (D.Mass. 1986), aff'd 836 F.2d 1340 (1 Cir.1987).
We perceive no need to adopt an ironclad rule here. We merely observe, as has the United States Supreme Court in a somewhat related context, that whenever potentially exculpatory *42 evidence is permanently lost or destroyed because of law enforcement neglect or oversight, "judges face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." See California v. Trombetta, 467 U.S. 479, 486, 104 S.Ct. 2528, 2533, 81 L.Ed.2d 413, 421 (1984). Fashioning remedies for illegal destruction of evidence can pose "troubling choices." Ibid. Unlike nondisclosure cases, such as Brady v. Maryland, supra, and its progeny, the court cannot simply grant the defendant a new trial at which the previously suppressed evidence may be introduced. Rather, the unpalatable choice is often reduced to either barring further prosecution  as the trial court did in this case  or suppressing what may well be the State's most probative evidence. California v. Trombetta, supra, 467 U.S. at 487, 104 S.Ct. at 2533, 81 L.Ed.2d at 421. See also United States v. Valenzuela-Bernal, supra, 458 U.S. at 872-873, 102 S.Ct. at 3449-50, 73 L.Ed.2d at 1206. Compare State v. Serret, 198 N.J. Super. 21, 26-28 (App.Div. 1984), certif. den. 101 N.J. 217 (1985); State v. Washington, 165 N.J. Super. 149, 156 (App.Div. 1979); State v. Laganella, 144 N.J. Super. 268, 282-283 (App. Div. 1976), app. dism. 74 N.J. 256 (1976) with State v. Hunt, 184 N.J. Super. 304, 307-309 (Law Div. 1981); State v. Lewis, 137 N.J. Super. 167, 173 (Law Div. 1975).
Within this conceptual framework, we stress two competing factors present in this case. First, there is no evidence in the record suggestive of bad faith or connivance on the part of the police in failing to preserve the photographic arrays. Whatever else may be said of Smith's subsequent reprehensible conduct in seeking to conceal his failure to record the pretrial photographic identifications, the proofs presented at the hearings are barren of anything revealing an evil intent or purpose on his part to deliberately destroy the arrays or otherwise preclude the defense from having access to them. Stated somewhat differently, there is no doubt that, while Smith later engaged in a course of conduct designed to conceal his error, his initial failure to preserve the photographic arrays constituted the *43 product of mere negligence, however gross it may have been. Second, the trial court found, and we agree, that the circumstances surrounding Daniels' pretrial photographic identifications of defendants cannot fairly be reconstructed. At this late date, and in light of Smith's failed attempt to hide his mistake, we cannot fairly say that the trial court was wrong in its holding that the pretrial identification procedures cannot reasonably be constructed by testimony.
We thus find that the trial court did not mistakenly exercise its discretion by suppressing evidence of the pretrial photographic identifications, see State v. Zarinsky, supra, 143 N.J. Super. at 58, but that it committed error when it arbitrarily dismissed defendants' indictments simply on the basis that they charged two or less drug transactions. This facile, bright-line solution to the problem ignores the possibility that Daniels might be able to identify defendants in court solely on the basis of his observations and impressions made during the course of the investigation. The record reflects that the "Hollow" is not an expansive area geographically, and it is possible that Daniels met or saw defendants on occasions other than when the drug transactions charged in the indictment are alleged to have occurred. Wholly apart from this possibility, the drug sales that allegedly took place might possibly have had distinctive aspects which could reasonably leave a lasting imprint in Daniels' mind. Of course, all of this is speculation at this posture of the case. Although Daniels testified that he was able to make in-court identifications without regard to the pretrial photographic procedures, the question was not fully explored by counsel and no specific finding was made by the trial court. In point of fact, as we noted at the outset of our opinion, the pretrial hearing conducted by the trial court involved only four defendants. In our view, whether or not Daniels can make positive in-court identifications independent of the taint connected with the pretrial photographic identifications must be the subject of further inquiry, and the case against each defendant must be considered separately.
*44 In determining whether these prosecutions must be aborted, the reliability of Daniels' in-court identifications must be the "linchpin." Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977). See also Neil v. Biggers, 409 U.S. 188, 198-199, 93 S.Ct. 375, 381-382, 34 L.Ed.2d 401, 410-411 (1972). The admissibility of Daniels' in-court identifications, and hence the viability of continued prosecutions, will rest upon whether there are present sufficient indicia of reliability to outweigh the corrupting influence of the pretrial photographic confrontations. Cf. State v. Madison, 109 N.J. 223, 239 (1988). The question to be decided is whether, granting establishment of the primary illegality, here the failure to preserve the photographic arrays, Daniels' in-court identifications would be arrived at by reason of an independent source. This determination is to be made from the totality of the circumstances of each particular case, and involves weighing the corruptive influence of the pretrial photographic identifications against the "opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson v. Brathwaite, supra, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154. See also State v. Madison, supra, 109 N.J. at 239-240; State v. Carter, supra, 91 N.J. at 129-130; State v. Hurd, 86 N.J. 525, 546-547 (1981); State v. Ford, 79 N.J. 136, 137 (1979) (Pashman, J., concurring); State v. Thompson, 59 N.J. 396, 414 (1971). In assessing the corruptive effect of the pretrial photographic identifications, the court should consider and weigh against the State the fact that the arrays were not preserved and that the defense is at a disadvantage in its efforts to reconstruct the events.[1] We nevertheless note *45 that the United States Supreme Court has not adopted a per se rule barring admission of an in-court identification based on the government's failure to preserve a pretrial photographic array. Although the issue was addressed only briefly in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Court refused to reverse a conviction on this basis. 390 U.S. at 388-389, 88 S.Ct. at 973-974, 19 L.Ed.2d at 1255-1256. In a similar vein, the Court in United States v. Wade, supra, did not preclude the government from admitting an in-court identification in the face of a claim that the absence of counsel at a pretrial confrontation prevented the defense from effectively reconstructing the event. 388 U.S. at 241-242, 87 S.Ct. at 1939-1940, 18 L.Ed.2d at 1165-1166. In the interests of fairness, however, we are of the view that the State should bear the burden of proving, by clear and convincing evidence, that any in-court identification made by Daniels is derived from an independent source. Cf. State v. Madison, supra, 109 N.J. at 245.

IV.
We, therefore, conclude that the appropriate remedy in this case is to remand to the trial court for a taint hearing to determine whether Daniels can positively identify defendants in court and, if so, to assess whether such identifications are of independent origin. The State will bear the burden of proving by clear and convincing evidence that the identifications of Daniels spring from a source other than the pretrial photographic confrontations. If the State can satisfy this formidable burden, the cases should proceed to trial. If not, the indictments should be dismissed.
We need not address what curative actions can be taken by the trial court in the event the State succeeds in meeting its burden and these matters proceed to trial. Obviously, the defense should be permitted to admit evidence pertaining to Smith's failure to preserve the arrays and his attempt *46 to conceal this fact. So too, the jury, by carefully tailored instructions, should be informed of the State's failure to comply with the mandate of State v. Earle, supra, and the impact of that fact on the defense's ability to reconstruct what occurred at the pretrial photographic confrontations. Beyond this, we have no occasion to decide what further ameliorative steps should be taken.

V.
Accordingly, the orders dismissing defendants' indictments are reversed. The matter is remanded to the Law Division for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] We recognize that a reasonable inference could be made from the court's factual findings that certain photographic identifications by Daniels were impermissibly influenced by Smith.