701 A.2d 1296

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. EDWARD N. ALFANO, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 7, 1997—Decided October 30, 1997.

180

Before Judges LONG, STERN and KIMMELMAN.

*Peter S. Hamerslag* and *Simon Louis Rosenbach*, Assistant Middlesex County Prosecutors, argued the cause for appellant (*Robert W. Gluck*, Middlesex County Prosecutor, attorney; *Mr. Hamerslag* and *Mr. Rosenbach*, of counsel; *Mr. Rosenbach*, on the brief).

*Steven D. Altman* argued the cause for respondent (*Benedict & Altman*, attorneys; *Mr. Altman* and *Doris E. McNeil*, on the brief).

The opinion of the court was delivered by

STERN, J.A.D.

The State appeals, pursuant to leave granted, from portions of an order of the Law Division entered on March 12, 1997, "recusing Assistant Prosecutor Peter Hamerslag from prosecuting the case of M.M.K. as the alleged victim" and severing the counts of the indictment relating to M.M.K. from those relating to victim M.A.R. We reverse the order disqualifying the prosecutor and remand for further proceedings on the issue of severance.

The background for this appeal is taken from the grand jury transcript of August 29, 1995 and material before the trial court on defendant's motion to sever and his motion "for an order dismiss-

ing the indictment and other relief" including an order recusing Hamerslag "from prosecuting this case predicated upon his being a factual witness." At the grand jury hearing both M.M.K. and M.A.R. testified, and M.M.K.'s prior 1993 grand jury testimony was read to the grand jurors by the Edison Police Lieutenant who investigated the matter and appeared as a witness at both grand jury presentations.

## I.

In February 1990, the Division of Youth and Family Services ("DYFS") received information that defendant was having sex with M.M.K. who was born on April 29, 1977. At the time, M.M.K. was twelve years old and defendant was forty. The DYFS investigation was subsequently suspended because M.M.K. and defendant both denied any sexual relationship. Approximately one year later DYFS received new information that defendant was engaging in sexual activity with M.M.K. Another investigation ensued but, like the first, it ended without the filing of proceedings, essentially for the same reasons.

On August 27, 1991, M.M.K.'s mother reported to the Edison Police Department that defendant, her ex-boyfriend, admitted to her that he had been having sex with M.M.K. In response, the police initiated an investigation. Both M.M.K. and defendant again denied having any sexual contact with the other. Both attributed the mother's allegation to defendant's recent break-up with her and his planned marriage to another woman. Accordingly, the police investigation was closed without the filing of charges.

However, in June 1992 after seeing an Oprah Winfrey show about adults who had been sexually molested when they were children, M.M.K. told her new boyfriend, close girlfriend and then her mother about her sexual relationship with defendant. The mother again contacted the police. Interviews confirmed the conversations and M.M.K. gave the police details about her sexual relationship with defendant. According to later reports, however, her story at that time was incomplete.

M.M.K. first met defendant when she was eleven years old. M.M.K. was a friend of defendant's daughter, and M.M.K. frequently spent time at defendant's home. One day in 1988 when M.M.K. visited defendant's house, defendant invited M.M.K. to his bedroom to watch television while his daughter left the house. Defendant offered M.M.K. a pillow, started tickling her, and then "pulled [her] on top of him." M.M.K. pushed defendant away and sat up. Defendant then kissed her on the lips. M.M.K. said "no" in response and the incident was interrupted by the entry of defendant's daughter.

On a subsequent occasion shortly thereafter, defendant "grabbed" M.M.K.'s "butt" and within a month of the first incident defendant began to "fondle" M.M.K.'s breasts and vaginal area, both over and underneath her clothing. Eventually, defendant began inserting his fingers into M.M.K.'s vagina. These incidents occurred at both the defendant's and M.M.K.'s respective homes, usually when nobody else was home. The sexual conduct between defendant and M.M.K. included oral sex.

Defendant also attempted to have vaginal intercourse with M.M.K. At first he was unsuccessful, but ultimately that occurred at age thirteen.

In May 1990, M.M.K. started dating a boyfriend, and the sexual activity with defendant ceased because she "wasn't around as much." In the nearly two years of sexual contact that defendant had with M.M.K., there was some sort of sexual activity occurring between them on a daily basis.

In August 1991, M.M.K. and her boyfriend split up, and the sexual activity between defendant and M.M.K. resumed. Their relationship included sexual intercourse, and defendant took M.M.K. to hotels about once a week to have sex. However, in May 1992 M.M.K. started dating another boy closer to her own age and the sexual activity with defendant ended again.

As we already noted, around June 1992 M.M.K. disclosed first to friends and then to her mother that she had been sexually

involved with defendant. However, M.M.K. then reported only the sexual activity that occurred between September 1988 and May 1990, before she met her first boyfriend. On June 18, 1992, a criminal complaint was filed, and defendant was arrested the following day.

On June 10, 1993 defendant was indicted for aggravated sexual assault based on sexual penetration with M.M.K. while she was less than thirteen years of age between September 1988 and April 1990, *N.J.S.A.* 2C:14–2a (count one), sexual assault by sexual penetration upon M.M.K. in May 1990 when she was between thirteen and sixteen years old, *N.J.S.A.* 2C:14–2c (count two), sexual assault on M.M.K. while she was under thirteen years of age between September 1988 and April 1988 and he was at least four years older, *N.J.S.A.* 2C:14–2b (count three), and endangering the welfare of M.M.K. as a minor between September 1988 and May 1990, *N.J.S.A.* 2C:24–4a (count four).

In preparing the indictment for trial, Assistant Prosecutor Hamerslag met with Lieutenant Carol Whalen, the Edison Police officer who initially investigated the matter. Whalen reported to Hamerslag about another investigation involving similar alleged conduct by defendant with a different young woman, M.A.R. That investigation had been closed in March 1993 when the young woman's family declined to cooperate. However, after being contacted again in January 1995, M.A.R. agreed to cooperate and gave a statement to Whalen.

M.A.R., born on September 15, 1975, was a friend of defendant's son, Chris, and would frequently visit Chris at defendant's home. M.A.R. recalled that from July through October of 1991, when she was fifteen years old, she was subjected to several incidents involving sexual overtures by defendant. M.A.R. remembered that around the Fourth of July that year she attended a barbecue at defendant's home. At one point while M.A.R. was alone in Chris' bedroom brushing her hair, defendant walked in and asked her what she wanted to eat. Defendant "sat [M.A.R.] down" on the bed and tried to kiss her. M.A.R. resisted and attempted to

get up. Defendant finally stopped his advances after M.A.R. repeatedly pushed away.

Sometime thereafter, M.A.R. ran away from home and needed a place to spend the night. M.A.R. phoned defendant's house intending to speak to Chris but instead spoke with defendant because Chris was not at home. Defendant offered to put M.A.R. up in a motel for the night. M.A.R. accepted the offer, believing that defendant would pay for the motel, drop her off, and then "go about his business." Defendant picked up M.A.R. and drove her to a motel on Route 1 in Linden. Defendant paid for the room, showed M.A.R. into the room and closed the door behind them. He then "tried pushing himself on" M.A.R., proceeded to lay her on the bed, got on top of her, and began "rubbing himself on [her]." M.A.R. protested and insisted that defendant take her home. Defendant eventually dropped M.A.R. off at an all-night Dunkin' Donuts attempting to kiss her again during the drive.

One or two months later, M.A.R. called defendant's house again looking for Chris who was not home. She hoped Chris could give her a ride to her grandmother's house where she was living. She was afraid of being tardy and locked out for the night. Defendant offered to give her the ride, and M.A.R. accepted the offer thinking that defendant would not try to repeat his previous conduct in light of her prior response. However, during the drive, defendant ignored M.A.R.'s directions to her grandmother's house and drove to an industrial area where he parked the car. Defendant tried to kiss M.A.R. and fondled her genital area. M.A.R. rejected these sexual advances and made it clear that she was not interested in having anything to do with defendant sexually. Defendant stopped his advances after M.A.R. told him "you're sick."

While preparing for trial on defendant's 1993 indictment, Hamerslag also began interviewing M.M.K. who revealed to him that defendant's sexual activity with her had not ended in May 1990 as she had initially reported. Rather, in 1995 M.M.K. reported that

defendant had again engaged in sexual activity with her from August 1991 to May 1992.

Based on the new information from M.M.K. and M.A.R.'s cooperation, Hamerslag re-presented the case to a grand jury. On September 15, 1995 a superseding indictment was returned charging defendant with aggravated sexual assault, *N.J.S.A.* 2C:14–2c, penetrating M.M.K. while under thirteen between September 1988 and April 1990 (count one); sexual assault, *N.J.S.A.* 2C:14–2a, between April 29, 1990 and May 30, 1990 and between August 1991 and May 1992, by sexually penetrating M.M.K. while she was between thirteen and sixteen years of age and he was at least four years older (count two); sexual assault upon M.M.K., *N.J.S.A.* 2C:14–2b, by contact with M.M.K. between September 1988 and April 1990 while she was under age thirteen (count three); endangering the welfare of M.M.K. between September 1988 and May 1992, *N.J.S.A.* 2C:24–4a (count four); attempted sexual assault upon M.A.R., *N.J.S.A.* 2C:5–1 and 2C:14–2c between August and October 1991 while she was between the ages of thirteen and sixteen, and he was more than four years older (count five); criminal sexual contact, *N.J.S.A.* 2C:14–3b, upon M.A.R. between August and October 1991, while she was between the ages of thirteen and sixteen and he was at least four years older (count six); and endangering the welfare of M.A.R. between June and September 1991, *N.J.S.A.* 2C:24–4a (count seven).

Shortly thereafter defendant filed the motions resulting in the orders before us.

## II.

Before the Law Division, defendant argued that because Hamerslag had conducted conversations with M.M.K. in the absence of a third party, he is the only person other than M.M.K. possessing knowledge of the details of those conversations. Thus, defendant contended that Hamerslag subjected himself to the possibility of becoming a witness because only Hamerslag could be called as a witness to challenge M.M.K.'s credibility. The trial court felt that

he could not "preclude prosecutors from talking to witnesses" but concluded that:

> prosecutors who talk to witnesses and present matters to [a] grand jury and then become thereby fact witnesses, it seems to me in this day and age become precluded from being the trial attorneys.

The judge believed that, although it was "admittedly a distant or remote possibility" that Hamerslag would become a fact witness, "thereby precipitating a mistrial," that would be "extremely harmful to the ... victims and potentially to the prosecution of the case." He therefore concluded that "Mr. Hamerslag must be precluded from trying the M.M.K. case."

Before us, the State contends that the trial court's position ignores the often necessary relationships that develop between trial prosecutors and their witnesses, particularly those witnesses who are also victims and who are initially embarrassed to reveal their involvement in criminal relationships. The State insists that prosecutors must be permitted to interview witnesses without fearing that they too must necessarily become witnesses in the case. The State also argues that, despite defendant's claim that it may be necessary to call Hamerslag as a witness, the information known to Hamerslag is readily available to defendant through discovery including the grand jury transcript. Thus, the State asserts that defendant will not be able to satisfy the "compelling and legitimate need" standard necessary to call the trial prosecutor as a witness.

■ We start our analysis by agreeing with the principle that trial prosecutors should not interview victims and other prospective witnesses in the absence of an investigator or other third person.

> The prosecutor should avoid interviewing a prospective witness except in the presence of a third person unless the prosecutor is prepared to forego impeachment of a witness by the prosecutor's own testimony as to what the witness stated in an interview or to seek leave to withdraw from the case in order to present his impeaching testimony.

> [American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function (Approved Draft,

1971) § 3.1(f) (quoted in *United States v. Birdman*, 602 *F.*2d 547, 552 (3d Cir.1979), *cert. denied*, 444 *U.S.* 1032, 100 *S.Ct.* 703, 62 *L.Ed.*2d 668 (1980).)]

As the commentary to the ABA standard explains:

Use of a third person is virtually the only effective means of impeaching a witness. Assuming a court would permit it, a prosecutor is in a difficult situation if he must seek leave to withdraw and substitute other counsel so that he might take the stand to relate what he claimed the adverse witness had said to him.
[*Id.*]

*See also R.P.C.* 3.7 (precluding a lawyer from acting as trial counsel when "the lawyer is likely to be a necessary witness . . . .").

This policy avoids the risk of having the prosecuting attorney disqualified as trial counsel in the event of a dispute regarding what the witness said in the pretrial interview. *See United States v. Wallach*, 788 *F.Supp.* 739, 743–44 (S.D.N.Y.), *aff'd on other grounds*, 979 *F.*2d 912 (2d Cir.1992), *cert. denied*, 508 *U.S.* 939, 113 *S.Ct.* 2414, 124 *L.Ed.*2d 637 (1993). That does not mean, however, that a judge should automatically disqualify a trial prosecutor because a pretrial interview was conducted in the absence of a third person or because of the mere possibility that the trial prosecutor's testimony may be required on the application of either party.

The State and federal constitutions guarantee defendants in a criminal prosecution the right of confrontation and compulsory process to obtain witnesses on their behalf. *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10. However, the determination of whether or not to allow a defendant to call the prosecuting attorney as a witness is a matter of discretion for the trial judge based on the issue involved. *See State v. Saez*, 268 *N.J.Super.* 250, 266–67, 633 *A.*2d 551 (App.Div.1993), *rev'd on other grounds*, 139 *N.J.* 279, 653 *A.*2d 1130 (1995) (finding no abuse of discretion in trial court's refusal to permit a defendant to call trial prosecutor as a witness); *United States v. Maloney, supra*, 241 *F.Supp.* 49, 50–51 (W.D.Pa. 1965).

We cannot presume that M.M.K. will not acknowledge any inconsistencies in her original pretrial and grand jury statements

and between those statements and her trial testimony. Nor can we presume that she will not honestly detail any unrecorded statements to Hamerslag. Moreover, defendant acknowledges that he received all the discovery to which he was entitled— discovery which is more liberal than many states and includes recorded statements of potential witnesses. *R.* 3:13–3(c)(7). It is therefore premature to suggest that the defense will need to solicit the prosecutor's testimony.[1] Thus, the trial court should not have ordered the trial prosecutor out of the M.M.K. case at this time. The issue concerning whether the defense can call Hamerslag at trial can be considered "only upon a full offer of proof" "at the time defendant wishes to make his move." *United States v. Maloney, supra,* 241 *F.Supp.* 49, 50–51. *See also United States v. Birdman,* 602 *F.*2d 547, 555–56 (3d Cir.1979), *cert. denied,* 444 *U.S.* 1032, 100 *S.Ct.* 703, 62 *L.Ed.*2d 668 (1980).

We agree with the State that *Wallach, supra,* is instructive. There, after a defendant's conviction was reversed because of the perjury of a principal government witness during trial, the defendant moved to disqualify the trial attorneys who handled the first prosecution, in part, because "they are necessary witnesses who will be called to testify to statements made to them" by the witness. *Wallach, supra,* 788 *F.Supp.* at 742. Defendant insisted that trial counsel's testimony may be needed to "impeach" the witness' "false statements" at the second trial. *Id.* at 743. The trial judge concluded that "even if such evidence is deemed relevant ... it is not clear that such evidence, if relevant, cannot be obtained through other heretofore sanctioned means." *Id.* There, however, a federal agent or third party was always privy to the interviews of the witness by trial counsel, and "could be called" to the stand. 788 *F.Supp.* at 744. However, in its opinion the federal district court added the following:

---

[1] It is also premature to suggest that the prosecutor will request the opportunity to take the stand. By electing to try the case, Hamerslag takes the risk he will not be able to call himself. *See R.P.C.* 3.7. In any event, it is the defense which insists he may become a witness and we address only its concern.

The law does not liberally permit a defendant to call a prosecutor as a witness. On the contrary, a defendant must demonstrate a compelling and legitimate need to do so. *United States v. Schwartzbaum*, 527 F.2d 249, 253 (2d Cir.1975), cert. denied, 424 U.S. 942, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976); *United States v. Torres*, 503 F.2d 1120, 1124 (2d Cir.1974).

Moreover, the necessity of calling any witness to testify to matters concerning conversations or agreements between the government and [the witness] is sharply reduced, if not eliminated, by the government's offer to stipulate to much of what Wallach says he wishes to introduce through testimony of the prosecutors. Stipulations provide an adequate substitute for testimony and may eliminate the need to disqualify an attorney based on conversations between the attorney and a witness. See *[United] States v. Diozzi*, 807 F.2d 10, 13–14 (1st Cir.1986). The government has offered to enter into a long list of stipulations regarding [the witness'] gambling, his perjurious denial of such gambling at trial, and the fact that these actions violated his cooperation agreement. The government has also offered to stipulate further, should such additional stipulations be relevant, Wallach also has the opportunity to attack [the witness'] credibility, should such attack be relevant, by introducing evidence of [the witness'] perjury conviction, Fed.R.Evid. 609(a)(2), and may be permitted to contradict testimony given at the retrial by reading portions of the transcript from the first trial.

Given the present prosecutors' familiarity with the case, gained through the extensive involvement they have had ... it would cause an extreme waste of resources to order them now replaced. Wallach's assertion that hundreds of other Assistant United States Attorneys are available to handle the retrial is no answer and such a late-hour transfer could well severely prejudice the government. Wallach has failed to demonstrate that disqualification is necessary, and accordingly the motion is denied.

[*United States v. Wallach, supra*, 788 *F.Supp.* at 743–44.]

Defendant has made no showing of a "compelling and legitimate need" to call the trial prosecutor. *See also State v. Boiardo*, 83 *N.J.* 350, 359–60, 416 *A.2d* 793 (1980) (using "legitimate need" standard for compulsory process.) Hamerslag has represented that everything he knows about this case was placed on the record as reflected in the 1995 grand jury transcript. Additionally, Hamerslag has expressed awareness of his ethical and professional obligations as a prosecutor to alert the court to any inconsistencies or contradictions which may occur during M.M.K.'s trial testimony. He has further expressed a willingness to stipulate impeachment evidence, if that need occurs. While we do not know what will actually occur during trial and if any alternative to calling Hamerslag as a witness may suffice in the event there is a sufficient showing that his testimony is needed, we conclude that

the pretrial decision to disqualify Hamerslag as trial counsel constituted an improper exercise of discretion. It was premature to conclude that his testimony would ever be needed at trial.[2]

### III.

The State's motion for leave to appeal, which we granted, also argued that "the trial court erred in granting a severance of the two sets of charges involving the two victims." Defendant had successfully moved to sever counts five, six and seven involving M.A.R. from counts one, two, three and four involving M.M.K. The trial court's order also granted "[d]efendant's Motion for an Order prohibiting the State from introducing into evidence any reference of sex acts committed by the defendant against the juvenile M.A.R. in the trial of M.M.K.," and "prohibited [the State] from introducing into evidence any reference of any sex acts committed by defendant against M.M.K. in the trial of M.A.R."

Leave to appeal is "highly discretionary" extraordinary relief and granted only to consider a fundamental claim which could infect a trial and would otherwise be irremediable in the ordinary course. *State v. Reldan,* 100 *N.J.* 187, 205, 495 *A.*2d 76 (1985); Pressler, *Current N.J. Court Rules,* comment on *R.* 2:2–4. In a criminal case leave to appeal is ordinarily granted to the State when the trial judge suppresses evidence because of the jeopardy consequences which flow from an acquittal at the trial which follows the suppression. *See Reldan, supra; R.* 2:2–4; *R.* 2:5–6. Here, leave to appeal was granted undoubtedly because the trial prosecutor was ordered out of the case involving M.M.K., and we cannot speculate as to whether the disqualification issue impacted on the trial judge's decision to sever the counts involving M.M.K. from the counts involving M.A.R. The decision to sever counts of an indictment is generally a subject left to the sound

---

[2] We do not address any issue which may flow from an attempt by defendant to call Hamerslag as a witness during the trial. *See, e.g., R.P.C.* 3.7.

discretion of the trial judge. *See, e.g., State v. Chenique–Puey,* 145 *N.J.* 334, 341, 678 *A.2d* 694 (1996).

We vacate the order granting leave to appeal the severance ruling, but remand for reconsideration in light of our ruling on the disqualification and the recent Supreme Court opinions considering issues under *N.J.R.E.* 404(b), which were decided since the order under review was entered. *See State v. Marrero,* 148 *N.J.* 469, 483, 691 *A.2d* 293 (1997); *State v. Nance,* 148 *N.J.* 376, 389–90, 689 *A.2d* 1351 (1997). Central to the severance issue is " 'whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [*N.J.R.E.* 404(b) ] in the trial of the remaining charges.' " *State v. Chenique–Puey, supra,* 145 *N.J.* at 341, 678 *A.2d* 694, quoting *State v. Pitts,* 116 *N.J.* 580, 601–02, 562 *A.2d* 1320 (1989).[3]

Before the grand jury both M.M.K. and M.A.R. remembered an incident when they were walking along a street in Edison when defendant stopped his car and offered them a ride. M.M.K. got in, but M.A.R. declined. When in the car defendant told M.M.K. he had to "tell someone" that he found M.A.R. "attractive" and could not "help it." On another occasion after she discontinued their relationship in May 1992, M.M.K. called defendant. During the conversation she mentioned that she heard of defendant's "attempt" with M.A.R. According to M.M.K., defendant responded "that was a waste of my time."

By its terms the trial judge's severance order "only applies to sex acts in both trials, and does not limit or prohibit the State from calling as a witness either M.A.R. or M.M.K. in order to establish other relevant information." Presumably, these statements attributable to defendant would be admissible under *N.J.R.E.* 803(c)(25). But the State points to other sexual and non-sexual acts, such as the fact defendant took both young women to the same motel, as relevant and admissible in the cases involving

---

[3] We need not detail any differences between cases involving multiple charges upon the same or different victims.

both victims. And if evidence exists that would be admissible under *N.J.R.E.* 404(b) at both trials, the defendant would not suffer substantially more prejudice in a joint trial than he would in separate trials, even though the jury instructions on admissibility might differ. *See State v. Chenique–Puey, supra,* 145 *N.J.* at 341, 678 *A.*2d 694; *see also State v. Modell,* 260 *N.J.Super.* 227, 246, 615 *A.*2d 1264 (App.Div.1992), *certif. denied,* 133 *N.J.* 432, 627 *A.*2d 1138 (1993); *R.* 3:7–6; *R.* 3:15–2. Accordingly, the question of severance should be further explored before the trial judge.

## IV.

The order under review is reversed to the extent it disqualifies Assistant Prosecutor Hamerslag from trying the case involving M.M.K. The matter is remanded for further proceedings consistent with this opinion.