853 A.2d 311 (2004)
371 N.J.Super. 371
STATE of New Jersey, Plaintiff-Appellant,
v.
Michael RUFFIN, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted February 9, 2004.
Decided July 27, 2004.
*314 James F. Avigliano, Passaic County Prosecutor, attorney for appellant (Steven E. Braun, Chief Assistant Prosecutor, of counsel and on the brief).
Yvonne Smith Segars, Public Defender, attorney for respondent (Robert Seelenfrend, Assistant Deputy Public Defender, of counsel and on the brief).
Before Judges COLLESTER, FUENTES and BILDER.
The opinion of the court was delivered by
COLLESTER, J.A.D.
The State appeals from an order of the Law Division dismissing an indictment against defendant Michael Ruffin with prejudice. We reverse.
Defendant was indicted by a Passaic County grand jury for the crimes of third-degree burglary (N.J.S.A. 2C:18-2), fourth-degree theft (N.J.S.A. 2C:20-3) and fourth-degree credit card theft (N.J.S.A. 2C:21-6c(1)). His first trial ended in a mistrial in June 2003, following the inability of the jury to reach a unanimous verdict. His retrial began on October 7, 2003. A jury was selected, but before it was sworn, the trial judge considered defendant's motion in limine for an evidentiary hearing on the admissibility of identification testimony by the victim. The State objected on grounds that the judge at the earlier trial admitted the testimony and that the ruling was "the law of the case." However, the retrial judge declined to follow the prior ruling and ordered an evidentiary hearing, describing its scope as follows:

*315 [T]he hearing that is required to be conducted here is a two-pronged hearing. One, whether there was any impermissibly suggestive photographic identification procedure utilized by the police and secondly, whether the failure of the police to preserve any such photographic array or the photographs used in this procedure affects the integrity of the criminal justice process to such an extent that the sanction of dismissal is warranted under State v. Peterkin.

At the hearing the State called its eyewitness, Alexandra Batista. Ms. Batista related that in the early hours of March 21, 2001, she had fallen asleep with her bedroom light on. At about 2:30 a.m., while she was still "halfway asleep," she saw a man enter her bedroom. The man stood six to seven feet from her bed, looked at her, saw she was awake, and said, "Hey, how you doing?" He then promptly left the room.
Ms. Batista reported the incident to the Paterson police, giving a description of the intruder as an African-American man, 5'7" to 5'10" tall, weighing about 145 to 150 pounds with "big eyes." Although she had never seen the man before that night, she told police she could identify him. Later that day, she received a call from Paterson Detective Carl Popewiny requesting her to come to police headquarters to see if she could pick out the intruder from books of photographs. Ms. Batista arrived the following morning. She met with Lieutenant Scott Verrone, who told her that Detective Popewiny left word that she should review some "mug books." Verrone led her to a cubicle and gave her several loose-leaf books containing photographs of African-American males. He told her that if she saw a photograph of the intruder, she was to take it out of the book and report to him at the police desk.
Ms. Batista recalled that there were at least four books, each with about forty pages of photographs and four photographs on each page. None of the photographs were damaged, dog-eared or highlighted in any way. After she looked through about two and a half books, Ms. Batista saw a photograph of the intruder. She reviewed the books she had already gone through to see if there were any duplicate pictures of the man and found none. After going through about twelve more pages, she stopped, removed the photograph from the plastic pocket and told Lieutenant Verrone she found a picture of the man. At his instruction she signed and dated the photograph. The photograph identified was of the defendant. Both at the first trial and the subsequent evidentiary hearing, Ms. Batista identified the picture she picked out of the mug book and made an in-court identification of defendant as the man who entered her bedroom in the early morning of March 21, 2001.
Detective Popewiny testified at the hearing that when he was told Ms. Batista believed she could identify the intruder, he asked her to come to Paterson headquarters to look through the appropriate mug books. He did not suggest to her that the intruder's photograph was among the ones she would view. He testified that his first knowledge of defendant was after Ms. Batista selected his photograph. When asked about how the mug books were created and maintained, Popewiny said the officers in the detective bureau divided photographs of arrested males in separate loose-leaf binders for white, Hispanic and African-American males. Four photographs were randomly placed in each loose-leaf page. There was no separation based on height, weight, hair style, facial hair or complexion. Most of the photographs were in color, and all the men were depicted looking straight into the camera. *316 Neither the books nor the pages were numbered. Each photograph had an identification number so that a computer search would bring up the name of the person depicted. If a witness selected a photograph, the picture was removed from the book and retained by the detective assigned. Another photograph was randomly assigned in its place. No records were kept of which books or photographs were reviewed by a witness.
Lieutenant Verrone testified that the mug books were kept in a metal closet in the detective bureau. He said that in early 2002 the mug books which had been used were "destroyed" because there were too many photographs in each book, many of which were outdated. New mug books were constructed to take their place. Since no records were kept of the photographs in the discarded books, it was impossible to recreate the books or duplicate all the photographs reviewed by Ms. Batista at police headquarters, which by her memory numbered over 400.
The trial judge excluded any trial testimony of Ms. Batista's out-of-court identification of the defendant on grounds that the mug books reviewed by Ms. Batista had not been preserved. He reasoned that since the books were not preserved in the same condition, the State had not satisfied its burden of proof.
... [I]t is clear that the police did not preserve the photographic book shown to the witness alleged to contain photographs ... of only black males who were contained in that book.
I'm not satisfied ... that the State has sustained the burden of proof with regard to the identification procedure utilized in this case as it pertains to those photographs. It is a requirement of the law that the police preserve such evidence so that the fairness of an identification procedure may be challenged. [Citing State v. Earle, 60 N.J. 550, 292 A.2d 2 (1972).]
... The testimony of Detective Popewiny ... is that the Paterson Police Department maintained at the time of this investigation eight books each containing four photographs per page, which were arranged in random order.... [A]ccording to his testimony, he wasn't sure whether they were all  all mixed  all color photographs or black and white or mixed. He has no idea of what particular photographs were shown to the witness. However, he further indicates that his police report contains no record of any identification of the photographs that were shown, the name of the other suspects who were contained in that book. There is no identifying number given to the book. There is no information from which such a photographic array could be reconstructed.
The trial judge went further. Although there was no conflicting testimony, he found that Popewiny and Verrone were untruthful in their testimony when they said the mug books in use at the time of Ms. Batista's photo identification had been discarded.
There is no plausible explanation offered by the police which would account for the failure to preserve the photographic books for later review ... I'm not satisfied that the books are destroyed. I suspect  and it's more plausible that the police are just too lazy to look for the books in the police department. They're probably being used to prop open a door somewhere or they're collecting dust in the basement somewhere at the P.D. But given the sheer size of the books and the fact that they were utilized by the police for so long, it's incredible to believe that they would simply throw them out or somehow destroy them *317 without making some record as to the destruction. Like all other evidence that is destroyed by police departments, generally there's some records, some indicia of what existed, what happened to it, whether it was destroyed, if it was destroyed.
....
I don't believe the testimony of the police. I don't believe Detective Popewiny and I don't believe the testimony of [Lieutenant Verrone] ... I just don't believe the testimony that these [mug books] don't exist.
The judge next concluded from the fact that the mug books were not produced at the evidentiary hearing that the Paterson Police Department had deliberately adopted a procedure to undermine a defendant's right to challenge an out-of-court photographic identification.
I believe that ... there is simply a procedure in the Paterson Police Department based on the evidence here to consciously not record this information in the hope that some Court will simply turn a blind eye to this defective procedure.
Well, this Court is not turning a blind eye to that procedure, which is constitutionally defective, which the police in today's world should know is constitutionally defective. State v. Earle goes back to the 1970s and there's a legion of cases dealing with this issue. Suffice it to say that I think that there is only the inescapable conclusion which is reached that ... it's a conscious or deliberate effort on the part of the police to engage in ... an effort to thwart the defense in investigating matters and precluding a fair determination.
I'm satisfied that the evidence here to me suggests bad faith on the part of the police in failing to preserve that photographic record.
....
... I can only conclude based on this testimony that there's really a deliberate policy of the police department to try to submarine the records, make them disappear.
Despite precluding the State from introducing evidence of Ms. Batista's out-of-court identification, the judge found that neither the photographs she reviewed nor the identification procedure employed indicated any undue suggestiveness and, therefore, her in-court identification of defendant was permitted.
There is insufficient evidence to establish in this case that there was, in fact, any suggestiveness in the photographic identification procedure that was used by the police. And the reason for barring the [out-of-court] evidence is because the defendant's fundamental right to a fair trial is implicated rather than as a result of any shown suggestiveness.
The assistant prosecutor immediately sought a stay in order to appeal the suppression of the out-of-court identification. The judge denied the motion, saying that the State's legal position "had no merit." He declared a fifteen minute recess so that the prosecutor could prepare his witnesses in light of the court's ruling. After half an hour, the trial judge resumed the bench, noted that the assistant prosecutor had not returned and said he would wait five minutes before taking action. Exactly five minutes later the judge stated on the record that he had personally called the Passaic County Prosecutor to express his displeasure with the absence of the assistant prosecutor. When the assistant prosecutor appeared shortly thereafter, he apologized to the judge and said that he had been discussing the court's ruling with members of the appellate section in an *318 effort to seek leave to appeal.[1] The judge responded that the conduct of the assistant prosecutor was a "flagrant affront to the dignity of this Court." While he accepted the assistant prosecutor's apology, the judge stated that "those he was with, who were in a supervisory capacity over him, knew or should have known there was a direct order from this Court to be here at a stated time." He issued an order directing that the Passaic County Prosecutor's Office pay the sum of $1,000 to the State Treasury "out of funds that are held by the Prosecutor's Office as forfeited funds which come from the proceeds of criminality that are utilized by the State of New Jersey for the law enforcement purposes in Passaic County."[2]
It was in this charged courtroom atmosphere that the assistant prosecutor again requested a stay of proceedings to appeal the evidential ruling, arguing
I should not be made to try a case in which half the evidence has now been taken out of the case. And we feel that we have a grounds to appeal Your Honor's decision on and there is some basis that we can argue.
The assistant prosecutor next told the court that the State would not consent to swearing the jury due to potential double jeopardy consequences and, moreover, if a stay was denied, the State would not proceed.
[I]n defense of the Prosecutor's Office we prosecute ... on behalf of the victim. We protect the victim's rights. This case has now taken a twist based on the evidence the State will not proceed on this matter. We are applying to the Appellate Court for a stay so that the Appellate Court can review Your Honor's ruling, and I will not proceed in this matter.
Following objection by the defendant to a stay, the judge stated:
... The State will not be granted a stay of that ruling in part because of the arrogance of the State in obtaining a de facto stay of this Court's ruling by proceeding in the manner that they proceeded today ... [T]he appellate division of the Prosecutor's Office was busy at work apparently formulating an appellate strategy including filing an application, the result of which we do not know at this juncture since I have not been advised of anything by any appellate judge.
....
What we do have here is a delay of game situation by the Prosecutor's Office, a strategy ... to attempt to obtain that which they... could not obtain from this Court, which is a stay.
Interpreting the assistant prosecutor's comments as a motion to dismiss the indictment, the judge declared:
The State now moves to dismiss this case and indicates that they will not proceed with the prosecution in the face of this Court's rulings on the day of trial ... [I]n the face of all of this I can only conclude that the State is making this *319 application for the purpose of perhaps trying this case arguably on some other day, re-indicting the defendant. That certainly is not something that's permitted by our laws. The New Jersey Constitution as well as the Federal Constitution guaranty the defendant a right to a fair trial and a right to a speedy trial. The State's  the State's procedure employed here simply would infringe upon that right of  those rights guaranteed by the State and Federal Constitution of this defendant to a fair trial to confront his accusers and all trial rights guaranteed to all citizens of this State and the United States.
So accordingly, this case will be dismissed by this Court with prejudice against the defendant because of the State's failure to prosecute this case on the trial date.
The trial judge supplemented his decisions barring the out-of-court identification and dismissing the indictment with prejudice in a written opinion on the same day. He reiterated that his reason for barring the use of the out-of-court identification was "the failure of the police to preserve the photographic books and photographs used in the identification process." With respect to his dismissal of the indictment with prejudice, the judge gave his version of events and his reasoning for dismissal of the indictment.
... [T]he State advised on the record that they would not proceed with the trial of this case and that they would voluntarily dismiss the case with a jury previously selected but not sworn waiting to hear the trial of this case. The defendant objected to the dismissal and asserted the defendant's right to trial.
This Court inquired of the assistant prosecutor as to whether this was what the State wanted to do in the face of a ruling which permitted the court identification to be made but no evidence as to the out-of-court photographic identification, at least absent an Order granting appellate relief which could have been pursued on a parallel tract. The assistant prosecutor confirmed the State's position on this matter.
This Court dismissed the indictment with prejudice based upon the State's failure to proceed on the indictment with the defendant present and ready to proceed to trial on the second trial of this case. The defendant is guaranteed the right to a trial, the right to confront witnesses and other trial rights under our State and Federal Constitutions. Due process and consideration of fundamental fairness warrants the dismissal of this indictment with prejudice based on the facts presented therein.

I.
The record reflects, and the defense agrees, that the judge was mistaken when he said that the State moved to dismiss the indictment, but the judge also based his dismissal of the indictment with prejudice on grounds of due process and fundamental fairness.
Unless defective, an indictment should not be dismissed except "on the clearest and plainest ground." State v. Hogan, 336 N.J.Super. 319, 344, 764 A.2d 1012 (App.Div.2001). Dismissal is the last resort because the public interest, the rights of victims and the integrity of the criminal justice system are at stake. In the Interest of D.J.C., 257 N.J.Super. 118, 121, 607 A.2d 1371 (App.Div.1992); see also, State v. Peterkin, 226 N.J.Super. 25, 38, 543 A.2d 466 (App.Div.), certif. denied, 114 N.J. 295, 554 A.2d 850 (1988); State v. Laganella, 144 N.J.Super. 268, 286-290, 365 A.2d 224 (App.Div.1976); People v. Sams, 685 P.2d 157, 162 (Colo.1984) (held that where police lost photo arrays, *320 dismissal of a criminal case was a "disproportionment sanction"); accord, People v. Shaw, 145 A.D.2d 515, 535 N.Y.S.2d 450, 451 (1988); see generally, Annotation: Dismissal of Indictment, 57 A.L.R. Fed. 824.
Peterkin is instructive. That case involved direct and clear police misconduct including fabrication of evidence. Even in these egregious circumstances we reversed the dismissal of the indictments, stating:
[O]ur courts have long held that a dismissal of an indictment is a draconian remedy and "should not be exercised except on `the clearest and plainest ground.'" State v. New Jersey Trade Waste Ass'n, 96 N.J. 8, 18-19, 472 A.2d 1050 (1984), quoting State v. Weleck, 10 N.J. 355, 364, 91 A.2d 751 (1952). See also, State v. LaFera, 35 N.J. 75, 81, 171 A.2d 311 (1961); State v. Porro, 175 N.J.Super. 49, 51, 417 A.2d 573 (App.Div.1980); State v. Davidson, 116 N.J.L. 325, 328, 184 A. 330 (Sup.Ct.1936). An indictment should stand "unless [it] is palpably defective." State v. Russo, 6 N.J.Super. 250, 254, 71 A.2d 142 (App.Div.1950), certif. denied, 4 N.J. 456, 73 A.2d 212 (1950). This well-recognized principle comports with the thesis that criminal cases should ordinarily be decided on the merits after a full and impartial trial.
[Id. at 38, 543 A.2d 466.]
As his rationale for dismissing the indictment, the trial judge relied upon the concept of fundamental fairness. We agree that a trial court has inherent power to fashion remedies in the interest of justice, which may include dismissal of a indictment for reasons of fundamental fairness even in circumstances where a defendant's constitutional rights are not implicated. State v. Cruz, 171 N.J. 419, 427, 794 A.2d 165 (2002); State v. Abbati, 99 N.J. 418, 427, 493 A.2d 513 (1985); State v. Torres, 328 N.J.Super. 77, 93, 744 A.2d 699 (App.Div.2000).
In State v. Dunns, 266 N.J.Super. 349, 629 A.2d 922 (App.Div.1993), we dismissed an indictment even though the State sought a third trial on the charges. The first trial was reversed for trial errors. The second ended in a mistrial when the key witness for the State, defendant's girlfriend, refused to testify despite being granted immunity, sentenced by the trial judge to jail for contempt and thereafter placed in a psychiatric ward. The trial judge adjourned the trial indefinitely, maintaining the jury with an "on call" status for three months until he finally declared a mistrial. The State sought to try the defendant a third time even through there was no assurance that the witness would testify. After defendant's motion to dismiss the indictment was denied, we granted leave to appeal. Noting that the bar against double jeopardy is based on the concept of fairness, see, Abbati, supra, 99 N.J. at 430, 493 A.2d 513, we concluded that even though the legal niceties of double jeopardy would not bar retrial, fundamental fairness required dismissal of the indictment.
Looking at the overall picture, i.e., the likelihood of success, the prejudicial impact on defendant, and other concerns, dismissal of the indictment is well-justified. We hold that further pursuit of this matter to a third trial would offend principles of fundamental fairness and not serve the ends of public justice. Upon considering all relevant factors, including the gravity of the remaining criminal charges, the public's concern about definitive conclusion of prosecutions, and the impact on defendant in terms of hardship and unfairness, we conclude the indictment must be dismissed.

*321 [Dunns, supra, 266 N.J.Super. at 381, 629 A.2d 922.]
The elements of fundamental fairness favoring dismissal of the indictment in Dunns and similar cases are wholly absent from this case. The State's witnesses were ready to testify. Jeopardy had not attached. The defendant was not in jail pending trial, and a short delay for the State to seek leave to appeal would not prejudice him. His rights of due process were not violated or compromised. The State was not endeavoring to avoid the trial or await better circumstances. It was seeking a delay to obtain a reversal of an order so it could, in fact, try the case with all its evidence, as it had done in the earlier trial. We find that fundamental fairness was not an appropriate ground upon which to dismiss the indictments.
We next address the issue whether the actions of the prosecutor mandate or justify dismissal of the indictment. Clearly the assistant prosecutor felt aggrieved by the evidential ruling of the court, and his statements are obviously a last ditch effort to obtain a stay to avoid the double jeopardy bar and seek appellate review. His comments also bespeak a failure to comprehend that a trial judge has the power to impose sanctions for a refusal to proceed, which may, in a proper case, include dismissal of the indictment with prejudice. See, State v. Slobiski, 100 N.J.Super. 590, 591, 242 A.2d 858 (App.Div.1968).
Once an indictment is returned, the case is under control of the court. See, e.g., State v. Leonardis, 73 N.J. 360, 375 A.2d 607 (1977); State v. Ashby, 43 N.J. 273, 204 A.2d 1 (1964). The prosecutor stands before the court not as a privileged suitor but as an attorney, an officer of the court who represents the State[3] and is on equal footing with the attorney representing the accused. A caveat is that the prosecutor has ethical obligations beyond that of other attorneys. Torres, supra, 328 N.J.Super. at 77, 744 A.2d 699; R.P.C. 3.8. As a constitutional officer, the prosecutor must ferret out crime and prosecute the guilty, but he is also charged with the responsibility of promoting fairness in and out of the courtroom. See, State v. Loftin, 146 N.J. 295, 386, 680 A.2d 677 (1996); State v. Farrell, 61 N.J. 99, 105, 293 A.2d 176 (1972); State v. Gomez, 341 N.J.Super. 560, 571, 775 A.2d 645 (App.Div.2001). As we said in State v. Clark, 347 N.J.Super. 497, 508, 790 A.2d 945 (App.Div.2002), "An overzealous prosecutor damages justice. A prosecutor acting to promote fairness is proof of justice."
Whether based on ignorance, intransigence or insolence, the refusal of the prosecutor to proceed was clearly wrong and subject to discipline. State v. Frost, 158 N.J. 76, 89, 727 A.2d 1 (1999). A criminal trial is not a game, and the courtroom is not a ball field where the *322 prosecutor may pick up his bat and glove and go home if he does not like the ruling of the umpire. The power and responsibility for the conduct, control and disposition of criminal trials resides in the trial judge, not the prosecutor.
As part of its responsibility, the trial court has the power to tightly control its calendar to assure the efficient administration of the criminal justice system. Abbati, supra, 99 N.J. at 427-28, 493 A.2d 513; State v. Furguson, 198 N.J.Super. 395, 401, 487 A.2d 730 (App.Div.), certif. denied, 101 N.J. 266, 501 A.2d 933 (1985). Accordingly, we have held that the intransigence of a prosecutor in the face of a direction by the court to assist in locating a material witness justifies the dismissal of an indictment. State v. Farquharson, 280 N.J.Super. 239, 254, 655 A.2d 84 (App.Div.), certif. denied, 142 N.J. 517, 665 A.2d 1109 (1995).
Moreover, in Slobiski, supra, 100 N.J.Super. at 590, 242 A.2d 858, a case with similar features to the case at bar, we held that the trial judge had the power to dismiss an indictment when the case was ready for trial and the State refused to proceed without good reason. The prosecutor based his refusal on the fact his witnesses had not been subpoenaed, but rejected the court's suggestion that the jury be selected and testimony begin after a weekend hiatus. We found the prosecutor's reason was invalid and that the refusal to accede to the court's suggestion "made it plain that the prosecutor's office was attempting to frustrate the trial court's control over its own trial calendar." Id. at 594, 242 A.2d 858.
Despite this inherent power of the court to dismiss an indictment due to dereliction or blundering by the prosecutor, it is obvious that the public interest in the completion of criminal trials weighs against such action where other remedies are available.
In this case, we find that while the assistant prosecutor was wrong in refusing to go forward, the trial judge mistakenly exercised his discretion in denying a stay of the proceedings to permit the State to seek leave to appeal of his ruling. Clearly the ruling substantially weakened the State's case by excluding an identification made of defendant one day after the crime and leaving the State with only an in-court identification more than two and a half years later. Since identification was the central and, quite probably, the only trial issue, the State's concern was obvious and was no doubt magnified by the fact that the first trial resulted in a hung jury when the out-of-court identification was admitted. There were no adverse consequences to a short stay. The selected jury was unsworn; no significant prejudice to the defendant would result from a recess; and we cannot fathom that the Passaic County criminal calendar would suffer to any measurable extent. As we have previously said,
..."[W]e must never forget that courts exist for the sole purpose of rendering justice according to law. No eagerness to expedite business, or to utilize fully the court's time, should be permitted to interfere with our high duty of administering justice in the individual case."
[D.J.C., supra, 257 N.J.Super. at 121, 607 A.2d 1371 (citations omitted).]
R. 2:3-1(b)(5) permits an appeal by the State in criminal actions from "an interlocutory order entered before, during or after trial." State v. Howard, 235 N.J.Super. 243, 257, 561 A.2d 1202 (App.Div.1989); State v. Elysee, 159 N.J.Super. 380, 388 A.2d 254 (App.Div.1978). While R. 2:5-6 provides that an application for leave to appeal does not stay proceedings in the absence of an order *323 to that effect, it is obvious that a short stay should not be denied to the State when evidence at the heart of the State's case is suppressed prior to the commencement of trial with double jeopardy consequences to follow. Leave to appeal is ordinarily granted to the State when evidence is suppressed prior to trial. State v. Alfano, 305 N.J.Super. 178, 190, 701 A.2d 1296 (App.Div.1997). Accordingly, it is was a mistake in the exercise of discretion to deprive the State of a reasonable time to seek that relief.
Therefore, we reverse and vacate the order dismissing the indictment against defendant. We also refer the matter of the prosecutor's conduct to the Attorney General as chief law enforcement officer of the State under N.J.S.A. 52:17B-98 for the proper exercise of his supervisory function. See, Frost, supra, 158 N.J. at 89, 727 A.2d 1; Torres, supra, 328 N.J.Super. at 95-96, 744 A.2d 699.

II.
Because this case must be retried, we address the trial judge's exclusion of the out-of-court photographic identification. We underscore that the trial judge did not find that the photographs shown to Ms. Batista were unduly suggestive or that the identification procedures by the police were improper. Rather, the ruling excluding evidence of the photographic identification was based upon the judge's perception that defendant's due process rights were violated by the failure of the police department to maintain the mug books shown to Ms. Batista in the same form or keep a record of the photographs and the order in which they were arranged.
The trial judge correctly found that the denial of the defendant's motion to suppress the out-of-court identification at the first trial did not foreclose subsequent consideration of the issue. The doctrine called "law of the case" is designed to avoid re-litigation of the same issue in the same controversy. It is, however, discretionary and to be flexibly applied in the interests of justice. State v. Reldan, 100 N.J. 187, 205-06, 495 A.2d 76 (1985). Where there has been a mistrial, the doctrine does not bind a subsequent judge to the same ruling. State v. Munoz, 340 N.J.Super. 204, 220, 774 A.2d 515 (App.Div.2001); State v. Cooper, 165 N.J.Super. 57, 65, 397 A.2d 702 (App.Div.), certif. granted, 81 N.J. 56, 404 A.2d 1155, State's appeal dismissed as moot, 81 N.J. 261, 405 A.2d 806 (1979) (defendant pleaded guilty).
The State argues that the defendant was not entitled to an evidentiary hearing under Wade[4] because he failed to make a threshold showing of suggestiveness. We agree there is no automatic entitlement to an evidentiary hearing on an out-of-court identification. Watkins v. Sowders, 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981); State v. Ortiz, 203 N.J.Super. 518, 521, 497 A.2d 552 (App.Div.), certif. denied, 102 N.J. 335, 508 A.2d 212 (1985); see also, United States ex. rel Fisher v. Driber, 546 F.2d 18, 22 (3rd Cir.1976). A threshold showing of some evidence of impermissive suggestiveness is required. Ortiz, supra, 203 N.J.Super. at 522, 497 A.2d 552. Accord, State v. Long, 119 N.J. 439, 487, 575 A.2d 435 (1990); State v. Gadsden, 303 N.J.Super. 491, 494, 697 A.2d 187 (App.Div.1997); State v. Rodriquez, 264 N.J.Super. 261, 269, 624 A.2d 605 (1993); State v. Madison, 109 N.J. 223, 232, 536 A.2d 254 (1988); Cooper, supra, 165 N.J.Super. at 65-66, 397 A.2d 702. Here the trial judge reviewed the transcripts of identification testimony at the prior trial and, in light of the State's concession *324 that photographs viewed by the eyewitness had not been preserved, he directed a hearing on the issue of whether the identification procedure was impermissively suggestive and whether the failure to preserve the photographs violated due process. We find no misapplication of discretion in granting an evidentiary hearing under these circumstances. Cooper, supra, 165 N.J.Super. at 66, 397 A.2d 702. See also, Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1249 (1968).
At the conclusion of the hearing the trial judge made a finding that the State had acted in bad faith by intentionally destroying or concealing the mug books viewed by Ms. Batista. He found the testimony of Popewiny and Verrone that the books had been discarded to be "unbelievable" and implied they were part of a cover-up. He excoriated the Paterson Police Department and its procedures and concluded, contrary to the testimony, that the books were in existence and were "submarined" to preclude a defendant from successfully challenging a photograph identification.
The court's finding of bad faith is crucial since the failure to preserve the photographs does not constitute a reason to preclude the out-of-court identification absent bad faith by the police. See generally, Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 338, 102 L.Ed.2d 281, 282 (1988). In Rodriquez, supra, 264 N.J.Super. at 270, 624 A.2d 605, we held that the failure to preserve a record of an out-of-court identification gave no relief to defendant without a showing of bad faith. Similarly in State v. Gunter, 231 N.J.Super. 34, 39, 554 A.2d 1356 (App.Div.), certif. denied, 117 N.J. 80, 563 A.2d 841 (1989), the loss of fifteen photographs was held not to preclude identification testimony absent proof that the State acted in bad faith.
We must give significant deference to the findings of a trial judge based on both the observations of the demeanor of the witnesses when testifying and the judge's "feel" of a case which cannot be transmitted on a written record. State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964); see also, State v. Locurto, 157 N.J. 463, 472-75, 724 A.2d 234 (1999); Trusky v. Ford Motor Co., 19 N.J.Super. 100, 104, 88 A.2d 235 (App.Div.1952) ("[T]he best and most accurate record [or oral testimony] is like a dehydrated peach; it has neither the substance nor the flavor of the peach before it was dried."). Our scope of review is limited to whether the findings made by the trial judge could reasonably be reached on substantial credible evidence present in the record. Johnson, supra, 42 N.J. at 162, 199 A.2d 809.
After careful review of the record, we have determined that the findings of the trial judge of bad faith by the police as well as police misconduct by destroying or concealing the mug books viewed by Ms. Batista, were not based on any testimony or reasonable inferences from the evidence, much less substantial credible evidence in the record. Rather, they represent mere suspicion of police misconduct and perjury grounded on a legal assumption by the judge that the failure to preserve all photographs shown to a witness necessitates the exclusion of an out-of-court identification. Indeed, the trial judge stated that it was "incredible" to believe that the books were not preserved. Since the trial judge's findings were based on this assumption, we need to give them deference only if we concur with his view of the law. Johnson, supra, 42 N.J. at 162, 199 A.2d 809; see also, State v. Loyal, 164 N.J. 418, 451-52, 753 A.2d 1073 (2000); Manalapan Realty, L.P. v. Township Committee, 140 N.J. 366, 378, 658 A.2d 1230 (1995).
*325 The trial judge's belief that the State was required to preserve the mug books was informed by his interpretation of State v. Earle, 60 N.J. 550, 292 A.2d 2 (1972). In that case the Supreme Court held that counsel for the defendant need not be present for certain lineups or photographic array identifications and then set forth the following procedures for out-of-court identifications:
[A]lthough counsel need not be present in these circumstances, enforcement authorities should nonetheless make a complete record of an identification procedure if it is feasible to do so, to the end that the event may be reconstructed in the testimony. The identity of persons participating in a lineup should be recorded, and a picture should be taken if it can be. If the identification is made or attempted on the basis of photographs, a record should be made of the photographs exhibited. We do not say a failure hereafter to follow such procedures will itself invalidate an identification, but such an omission, if not explained, should be weighed in deciding upon the probative value of the identification, out-of-court and in-court.

[Id. at 551, 292 A.2d 2. (Emphasis supplied.)]
Contrary to the understanding of the trial judge, Earle does not impose an exclusionary rule on an out-of-court identification if the stated procedures were not followed. It indicates that a departure from the procedures, if not properly explained, is to be considered on the issue of the probative value of the identification. We have since held that while a procedural lapse in failing to preserve the photographs may be considered in the weight to be assigned the identification, the identification is not excluded. See, Gunter, supra, 231 N.J.Super. at 34, 554 A.2d 1356; Rodriquez, supra, 264 N.J.Super. at 261, 624 A.2d 605.
The trial judge placed even greater reliance on Peterkin, supra, 226 N.J.Super. at 25, 543 A.2d 466. In that case New Jersey State Police Detective Roy Daniels was working undercover in the Town of Morristown and purchased controlled dangerous substances from numerous individuals in an area known as "The Hollow." Following each purchase, Daniels would meet with Morristown Detective James Smith, who was selected to assist Daniels in the identification process because of his familiarity with persons living in the area. Daniels would give Smith a description of the seller, and Smith would prepare a photo array of six or so photographs matching the description. If Daniels made an identification, he would remove the photograph and keep it in his State Police file. After thirty-two individuals had been arrested and indicted, it came to the attention of the prosecutor that Smith had not preserved the arrays or kept a record of the photographs shown to Daniels. Instead he tried to cover up his dereliction by fabricating evidence through randomly taking mug shots from the files of the Morristown Police Department and passing them off as the actual photographs shown to Daniels. After the prosecutor disclosed Smith's conduct, the trial judge held an evidentiary hearing and thereafter dismissed the indictments for failure to preserve the photographs used in the arrays.
We upheld the suppression of Daniels' photographic identifications due to the inability of the State to reconstruct the circumstances surrounding the identifications, but we reversed the dismissal of the indictments and remanded for a hearing to determine whether a sufficient independent source enabled Daniels to make an in-court identification of one or more defendants.
*326 In so holding we followed our earlier decision in State v. Zarinsky, 143 N.J.Super. 35, 362 A.2d 611 (App.Div.1976), aff'd, 75 N.J. 101, 380 A.2d 685 (1977). In Zarinsky, we affirmed a ruling to bar testimony of pretrial identifications because the array of seven photographs shown to witnesses was not preserved. However, we permitted in-court identifications based on the witnesses' independent observations at the time of the crime. Id. at 56-57, 362 A.2d 611.
The case at bar reveals an important factual distinction from Peterkin and Zarinsky. There, the witnesses were shown arrays of a relatively small number of photographs to see if identifications could be made of targeted suspects. Here Ms. Batista was given books to review containing hundreds of photographs in the hope of finding a suspect. The purpose was investigatory, not confirmatory. Defendant was not a suspect until he was identified by Ms. Batista.
Popewiny and Verrone testified that the mug books were shown to witnesses as a matter of course to see if a suspect could be found. While there were separate loose-leaf books for white males, Hispanic males and African-American males, the photographs in each book were randomly selected. The books were used as a on-going photo display for investigative purposes, and photographs were periodically changed or substituted before the dismantling and discarding of the books involved in this case. Even the trial judge found that there was no suggestion that either the photographs or their arrangement in the mug books was anything other than a neutral presentation.
To require preservation of all photographs shown to witnesses during an investigation before suspicion focused on a suspect or suspects would create an exclusionary rule requiring the segregation of all photographs and books viewed by witnesses who make identifications until disposition of the matters, possibly through trial and appeal, at the pain of suppressing an otherwise proper identification. Not only would the procedure be cumbersome, but it would also place an unnecessary burden on investigating processes and hinder or even eliminate the effective use of a traditional, non-invasive and proper law enforcement tool for no justifiable purpose.
While no New Jersey case is directly on point, the weight of authority favors rejection of such an exclusionary rule of evidence. In Commonwealth v. Brown, 376 Mass. 156, 380 N.E.2d 113 (1978), the State was unable to produce "two thick books" of photographs reviewed by a witness who selected and identified the defendant's photograph. The Massachusetts Supreme Judicial Court rejected the argument that the State was obligated to preserve and produce the photographs at trial so the jury could assess whether the identification procedure had been so suggestive as to affect its evidentiary weight.
[W]e hold that the judge was correct in allowing in evidence the photographic identification without requiring the accompanying introduction of the "two thick books" of photographs [the witness] had examined. The impracticability of requiring the segregation and production at trial of volumes of photographs shown to witnesses in the course of police investigation greatly outweighs any possible evidentiary value which an examination of such photographs might afford.
[Id. at 117.]
See further, Brown v. Streeter, 649 F.Supp. 1554 (D.Mass.1986), aff'd, 836 F.2d 1340 (1st Cir.1987) (defendant's application for habeas corpus denied).
*327 Similarly, in State v. Harris, 308 N.C. 159, 301 S.E.2d 91 (1983), the victim of an assault made a pretrial identification after she reviewed a "three-inch thick mug book" containing 150 color photographs of African-American males. The mug book was subsequently disassembled by the police and could not be reassembled by trial. The North Carolina Supreme Court found no error, stating:
All of the evidence in the present case indicates that the mug book was disassembled in good faith for legitimate administrative reasons, not to cover up an impermissibly suggestive procedure....Ms. Troyer was shown the mug book in 1974, and defendant was not arrested for the crimes of which he was indicted in this case until 1981. During this period the contents of the mug book may have changed daily as photos were added or deleted with the ebb and flow of suspects having similar features. In addition, a new filing system for photographs of suspects has been implemented in the Raleigh Police Department, and it is likely that some of the photos from the 1974 mug book have been misplaced or destroyed in the changeover. In the absence of any evidence tending to show that the original book of photos was not available because of a "cover-up," we decline to endorse a presumption that the reason the book was unavailable was due to police misconduct.
[Id. at 95.]
See also, United States v. Rivera, 465 F.Supp. 402 (S.D.N.Y.), aff'd, sub nom, United States v. Ramirez, 614 F.2d 1292 (2nd. Cir.1979) (no error in admission of photo identification where a number of photographs, including one of defendant identified by witness, were removed as part of periodic change of loose-leaf binder containing over 500 photographs and used as photo display); accord, Shaw, supra, 535 N.Y.S.2d at 451; People v. Kaiser, 113 Cal.App.3d 754, 764, 170 Cal.Rptr. 62 (1980) (where the victim was shown only four to six photographs, suppression was denied on grounds that "[a] mere claim that the procedure might have been unfair is not enough to require that the People must produce the photographs where evidence establishes their non-availability is due to inadvertence and not intended destruction ... the identification testimony was properly admitted.").
The cases relied on by defendant are distinguishable because the photographic arrays or lineups were comprised of few photographs and a targeted suspect.[5] In State v. Bauer, 123 Wis.2d 444, 368 N.W.2d 59 (App.1985), vacated on other grounds, 127 Wis.2d 125, 377 N.W.2d 175 (1985), cited by defendant, the court suppressed use of a photographic array and lineup. However, the court specifically approved the same procedure followed by the police in the instant case:
Only a limited duty to preserve arises, however when an identification is made from a compilation of photographs that includes all suspects wanted by the police. In such a case, the police only have to preserve photographs actually identified.

*328 [Id. at 65, fn. 5.]
We reject the reasoning and conclusion of the trial judge excluding the photographic identification for failure of the police to preserve the books of photographs viewed by Ms. Batista. We concur, however, with the finding that neither the photographs nor the identification procedure was "... so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable identification." Simmons, supra, 390 U.S. at 384, 88 S.Ct. at 967, 19 L.Ed.2d at 1253. A pre-trial photographic identification will be suppressed only where the identification procedures were unnecessarily suggestive and conducive to irreparable mistaken identification. Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977); Neil v. Biggers, 409 U.S. 188, 196, 93 S.Ct. 375, 383, 34 L.Ed.2d 401, 410 (1972). Such is not the case here.
Defendant's argument that the procedure might have been unfair is insufficient to suppress the photographic identification in light of the neutral procedure followed. See, Kaiser, supra, 113 Cal.App.3d at 764, 170 Cal.Rptr. 62. In light of our determination that the record does not establish that the books of photographs were destroyed or withheld with the intent to subvert the rights of the accused or any other acts of bad faith, we hold that the out-of-court photographic identification is admissible at trial.
Reversed and remanded.
NOTES
[1] While the appellate record is silent on the matter, both briefs assert that an oral emergent application for a stay was made by the State to one judge of this court pursuant to R. 2:9-8. The briefs indicate that an emergent stay was denied, although apparently no papers were filed, no reasons are given for the decision and there is no indication whether the decision was rendered before or after the trial court dismissed the indictment and excused the jury.
[2] The following day the judge sua sponte entered an order vacating "that portion of the [October 8, 2003 order] in this matter imposing a monetary sanction, the Court determining that the admonition on the record is sufficient to address this matter."
[3] In seeking to support his position, the assistant prosecutor commented "we prosecute on behalf of the victim" and "we protect the victim's rights." Such comments oversimplify both the power of the prosecutor and the rights of the victim. As chief law enforcement officer within a county designated to prosecute the criminal business in this State, N.J.S.A. 2A:158-4, the prosecutor may at times take discretionary actions in conflict with the interests and desires of victims. See, State v. Hessen, 145 N.J. 441, 678 A.2d 1082 (1996); State v. Hermann, 80 N.J. 122, 402 A.2d 236 (1979); State v. Ward, 303 N.J.Super. 47, 696 A.2d 48 (App.Div.1997); State v. Kraft, 265 N.J.Super. 106, 625 A.2d 579 (App.Div.1993); State v. Mitchell, 164 N.J.Super. 198, 395 A.2d 1257 (App.Div.1978). The rights of a crime victim are independent of the prosecutor. They are derived from common law and in this State, from the Constitution, N.J. Const. art. I, ¶ 22, and the Crime Victim's Bill of Rights, N.J.S.A. 52:4B-34 to -38. See, State v. Timmendequas, 161 N.J. 515, 737 A.2d 55 (1999).
[4] United States v. Wade, 388 U.S. 218, 240, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).
[5] In Commonwealth v. Jackson, 227 Pa.Super. 1, 323 A.2d 799 (1974), the defendant was in custody when the victim reviewed an array of fifteen to twenty photographs. See also, Sams, supra, 685 P.2d at 157 (photo arrays of "several persons"); State v. Burns, 441 So.2d 1294 (La.App. 1st Cir.1983), writ denied, 444 So.2d 1242 (La.1984) (photo lineup); Williams v. State, 642 So.2d 391 (Ala.1993) (photo lineup); State v. Pratt, 161 W.Va. 530, 244 S.E.2d 227 (1978) ("group" of photographs in "photographic display book"); People v. Posten, 108 Cal.App.3d 633, 166 Cal.Rptr. 661 (1980) (lineup of six photographs taken from a mug book).